915 So.2d 291 (2005)
STATE of Louisiana
v.
Glynn JUNIORS, Jr.
No. 2003-KA-2425.
Supreme Court of Louisiana.
June 29, 2005.
Opinion on Denial of Rehearing November 29, 2005.
*301 R. Neal Walker, Marcia Adele Widder, Jelpi Pierre Picou, Jr., New Orleans, LA, G. Benjamin Cohen, Counsel for Appellant.
Hon. Charles C. Foti, Jr., Attorney General, Hon. Anthony G. Falterman, District Attorney, Donald David Candell, Assistant District Attorney, Anthony Terrell Marshall, Gonzales, LA, Counsel for Appellee.
WEIMER, J.
This is a direct appeal under Louisiana Constitution article V, § 5(D) by the defendant, Glynn Juniors, Jr. On February 10, 1998, Ronald Williams and Juniors, were jointly indicted by a grand jury for the first degree murder of Albert "Butch" Robinson. Pursuant to a plea agreement with the State whereby he also agreed to testify against Juniors, Williams pled guilty to first degree murder and was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant was tried before a St. James Parish jury. Following the close of evidence, the jury found defendant guilty as charged and, at the conclusion of the penalty phase of the trial, recommended a sentence of death by lethal injection. The trial court sentenced defendant to death in accordance with that recommendation. In his appeal to this court, defendant raises thirty-four assignments of error. After a thorough review of the law and the evidence, we find no merit in any of the assignments of error urged by defendant. Therefore, we affirm the defendant's conviction and sentence.

FACTS AND PROCEDURAL HISTORY
On November 17, 1997, shortly before 5:00 p.m., Robinson and John C. "Jack" Jackson, Jr., were each shot once inside the offices of Jack Jackson, Inc. and Fleet Boats, Inc., in Convent, Louisiana, in an apparent robbery attempt. The assailant absconded with Robinson's wallet and a knife, and with Jackson's wallet and some cash. Jackson, who was shot in the back, managed to call 911 and a nearby business, Elmwood Marine Services. Jack Haskell, an employee of Elmwood Marine Services and a friend of both Jackson and Robinson, ran to the office and attempted to render aid. Emergency personnel arrived shortly after Haskell, and began providing care to both victims. Robinson, who was shot in the head just above the left eye, was flown by helicopter to Thibodaux Regional Medical Center where he underwent emergency surgery. He died the next day. Jackson was transported by ambulance to Our Lady of the Lake Hospital in Baton Rouge, where he was treated and released two days later.
At trial, Jackson recounted the events of that November 17, 1997. He testified that at approximately 3:00 p.m., he was approached *302 by a well-dressed, African-American male in the parking lot of the Fleet Boats office. The man asked him for a job application. Jackson led the man into the office, handed him the requested paperwork, and accompanied him back to the parking lot where they parted ways. Jackson then left to attend to various work-related tasks, both on and off the premises. He returned to the office at approximately 4:30 p.m. only to find the same individual who had approached him earlier standing outside the door of the office. This time the man asked if the welding job had been filled, and requested a second application. Jackson asked the man if he was Glynn Juniors, a person whom former employee Ronald Williams was going to send. The man responded negatively. Jackson then led the man into the office and handed him another application. The man asked Jackson if "the captain" was in and asked if he could speak with him. Jackson replied that Robinson was in the back office. The man proceeded to the back. Jackson, who remained behind to straighten the desk from which he had pulled the application, heard the man say "Butch." As he walked toward Robinson's office, Jackson could see Robinson standing at his desk holding one hand in the air. He heard a pop. Jackson entered the office only to discover Robinson with a gunshot wound above his eye. The assailant turned to Jackson, instructing him to empty his pockets and lie down on the floor. Jackson attempted to comply, but he was shot in the back before he could finish emptying his pockets. As Jackson lay prostrate on the floor, the man ransacked the office, ripping telephones from their jacks and throwing a computer monitor on top of Robinson. As he exited the room, the assailant kicked Jackson in the head.
In the weeks that followed, investigators developed several suspects, including Williams, a former Fleet Boats employee who reportedly called the Fleet Boats office on the afternoon of November 17, 1997, and spoke with Robinson. Debbie Wilson, the office secretary, reported that she overheard Robinson tell an individual who identified himself on the phone as "Ronald Williams" that he could stop by later that afternoon to pick something up. Investigators were unable to locate Williams for questioning.
On the evening of January 6, 1998, Williams and defendant were arrested shortly after they were captured on surveillance videotape attempting to rob the In & Out Food Store in Reserve, Louisiana. Defendant and Williams entered the store near closing time. Williams proceeded to the back of the store, where he slashed the throat of an elderly man. As defendant approached the counter, the cashier recognized him as a regular customer and reached up to retrieve defendant's usual brand of cigarettes. Defendant suddenly pulled out a gun, pointed it at the cashier's head, and demanded money. The cashier told defendant to calm down and that he was on a security camera, but defendant became more agitated and fired once. The cashier managed to dodge the bullet and retrieve his own weapon, which he kept hidden in a paper bag on the counter. When defendant leaned over the counter and again pointed his gun at the cashier, the cashier fired, wounding defendant. Defendant dropped to the floor and attempted to slide his gun to Williams. The gun stopped short of Williams' reach, coming to rest under a set of shelves. The two men fled the store. They were arrested by police a short time later.
The attempted robbery at the In & Out Food Store had similar characteristics to a December 22, 1997 unsolved robbery-homicide at BRS Seafood in LaPlace, Louisiana. *303 In that incident, the body of Joann Edler had been found in the walk-in cooler of the store, with her throat slashed and a gunshot wound to the head. Ballistics tests on the projectile and casing recovered at the scene indicated that the gun used in that incident was similar to the one used in the attempted robbery at the In & Out Food Store. Accordingly, the lead investigators in the BRS Seafood case were notified. They proceeded to the St. John Parish Sheriff's Office to interview Williams, who, under questioning, volunteered that he and defendant had also participated in the robbery and shooting at Fleet Boats. Officials from the St. John Parish Sheriff's Office called the St. James Sheriff's Office and informed them of Williams' admission.
On February 10, 1998, a St. James Parish grand jury returned indictments charging both defendant and Williams with the first degree murder of Albert "Butch" Robinson. By way of pre-trial motion, the State sought to introduce evidence from the BRS Seafood murder and the In & Out Food Store attempted armed robbery. The trial court conducted a hearing under State v. Prieur, 277 So.2d 126, 130 (La. 1973), and ruled the other crimes evidence admissible. Defendant sought writs. The court of appeal reversed, State v. Juniors, 99-0898 (La.App. 5 Cir. 8/12/99), and this court denied writs. State v. Juniors, 99-2472 (La.8/13/99), 747 So.2d 44.
On April 19, 1999, Williams pled guilty to first degree murder. Pursuant to the plea agreement, the court sentenced Williams to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. As part of the plea agreement, Williams agreed to testify against defendant.
Jury selection in defendant's case began on August 12, 1999, with the trial commencing four days later. At trial, Williams testified that on the afternoon of November 17, 1997, he and defendant drove from LaPlace to Convent in a gray Chevrolet Celebrity with the idea of robbing his former employer, whom he knew to carry a large amount of cash. Upon arriving in Convent, Williams dropped defendant off in the vicinity of the Fleet Boats office. The plan was for defendant to walk up to the office and ask for a job application so that he might "scope out" the premises. Williams circled back in his vehicle and retrieved defendant a short time later. The two men then drove around for a while, returning to the same location later in the day. According to Williams, the second time they approached the Fleet Boats office, he parked his car behind the nearby post office, got out, and walked to the front of the building. Defendant walked across a field to the Fleet Boats office. Williams returned to his car, popped the hood, and waited. After a few minutes, Williams heard two shots being fired, and the sound of items being thrown around. The defendant appeared across the field, walking from the direction of the Fleet Boats office. The men got in Williams' car and drove off. Later, defendant gave Williams a knife and approximately $285 to $295 in cash. Williams testified that defendant told him he shot each of the men in the head.
In addition to Williams' trial testimony, the State introduced testimony from Ms. Adine Hymel, a post office employee. Hymel explained that on the afternoon of November 17, 1997, as she was leaving work, she observed two men in a gray Chevrolet pull into the parking lot of the post office.
Larry McGee, a post office employee who was picking up the mail at about 4:45 p.m. that day, testified by stipulation. He reported that as he was locking the back door to the post office, he observed a well-dressed, *304 African-American man with a medium complexion get out of a gray Chevrolet Celebrity parked in the post office lot and walk though a field toward the Fleet Boats office with what appeared to be a stick in his hand.
The State also introduced physical and scientific evidence. The parties stipulated that when defendant was arrested on the evening of January 6, 1998, a Bryco .380 pistol was found in his possession. Expert testimony established that a bullet recovered from the Fleet Boats office was fired from the same Bryco pistol found in defendant's possession. Two casings recovered from the scene bore markings consistent with being fired from that same weapon. Janice Reeves, an expert in latent fingerprint identification, testified that the left thumb and index fingerprints of defendant were discovered on a pack of Merit Ultra Light cigarettes found on the floor of Robinson's office. The only other fingerprints identified were those of the victim, Robinson, whose right index fingerprint was found on the pack of Merit Ultra Light cigarettes. Testimony established that this was the brand of cigarettes Robinson regularly smoked. Finally, the knife that Williams testified he received from defendant was identified as a knife belonging to Robinson.
On August 17, 1999, following deliberations, the jury found defendant guilty as charged. After waiting the requisite twelve hours, the court began the penalty phase of the trial. The State introduced victim impact testimony, as well as evidence of the BRS Seafood and In & Out Food Store robberies. Defendant introduced testimony from family members.
At the conclusion of the penalty phase, the jury recommended that defendant be sentenced to death by lethal injection. Jurors found two aggravating circumstances: that defendant had knowingly created a risk of death or great bodily harm to more than one person; and that the victim had died during the commission of an armed robbery or attempted armed robbery. The trial court denied defendant's motions for new trial and for post-verdict judgment of acquittal. On June 22, 2000, the trial court sentenced defendant in accordance with the jury's recommendation. Defendant then filed a direct appeal in this court, asserting thirty-four assignments of error.[1]

LAW AND ANALYSIS

Voir Dire Challenges for Cause
In assignments of error Numbers 18 and 19, defendant asserts the trial court erred in denying his challenges for cause of potential jurors Keith Martin, Doris Poirrier, Clancey Louque, and James Becnel.
Louisiana Constitution article I, § 17 guarantees to a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of peremptory challenges granted a defendant in a capital case is fixed by law at twelve. LSA-C.Cr.P. art. 799. When a defendant uses all twelve of his peremptory challenges, an erroneous ruling of a trial court on a challenge for cause that results in depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. See State v. Cross, 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686; State v. Bourque, 622 So.2d 198, 225 (La.1993), overruled on other grounds *305 by State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16. Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and a defendant has exhausted his peremptory challenges. State v. Robertson, 92-2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280; State v. Ross, 623 So.2d 643, 644 (La.1993). Therefore, to establish reversible error warranting reversal of a conviction and sentence, defendant need only demonstrate (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. Cross, 93-1189 at 6, 658 So.2d at 686; Bourque, 622 So.2d at 225. In the instant case, defendant exhausted his peremptory challenges; therefore, we need only determine whether the trial court erred in denying defendant's challenges for cause.
Louisiana Code of Criminal Procedure article 797 provides, in pertinent part, that the State or the defendant may challenge a juror for cause on the ground that:
. . . .
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court;
. . . .
"[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990), quoting State v. Jones, 474 So.2d 919, 926 (La.1985). The trial court is vested with broad discretion in ruling on challenges for cause and these rulings will be reversed only when a review of the entire voir dire reveals an abuse of discretion. Cross, 93-1189 at 7, 658 So.2d at 686; Robertson, 92-2660 at 4, 630 So.2d at 1281.

Keith Martin
During voir dire, potential juror Keith Martin responded to questioning from defense counsel as follows:
MR. LARRE: ... Now, Mr. Martin, on your questionnaire, you said that you were for the death penalty, you could vote for the death penalty. And you also said that you know [Assistant District Attorney Thomas] Kliebert. Not only do you know Mr. Kliebert, but he's your landlord.
MR. MARTIN: Right.
MR. LARRE: So that means the land that you farm, his family or his company owns; is that correct?
MR. MARTIN: More or less, yes.
MR. LARRE: All right. He's going to be here doing a lot of the trial and talking to the jurors and making an argument and so forth. Would you tend to listen to what Mr. Kliebert says more than, say, what I say or  because you know him so well and you deal with him and you work with him on your farm?
MR. MARTIN: I don't think it would influence me. I was just asked if I had any kind of association and I just *306 stated it. I just wanted y'all to know that I did.
MR. LARRE: But you do know Mr. Kliebert pretty well and you have for a lot of years?
MR. MARTIN: I knew him for a while, yeah.
MR. LARRE: Now, you also said that you might have a hardship because it's not [sic] time to plant and do what needs to be done for your sugar cane?
MR. MARTIN: Right.
MR. LARRE: And that's your livelihood. That's how you feed your family.
MR. MARTIN: That would be a big distraction.
MR. LARRE: A big distraction. So that means you would be thinking about that while you're here trying to listen to what's going on in the trial?
MR. MARTIN: Probably so.
After listening to this exchange, the trial judge questioned Martin further:
THE COURT: Mr. Martin, you indicated that you, in fact, lease some land from Mr. Kliebert's family. If after the evidence in this case you felt that the State had not met it's [sic] burden,... hadn't proved the case, could you vote not guilty and look at Mr. Kliebert the next day with a clean conscience?
MR. MARTIN: I didn't say it'd influence me. I just  I was asked the question and I just answered the question that I had an association with him.
THE COURT: Right. But would that influence you in making a decision?
MR. MARTIN: No.
THE COURT: And you would have no problem facing him the next day 
MR. MARTIN: No. No problem.
Following this colloquy, defense counsel challenged Martin on two grounds. First, he challenged Martin on the basis of his relationship with the assistant district attorney. Second, he challenged Martin based on his statement that he would be distracted if forced to be away from his sugarcane crop.
In response to the defense challenge, Assistant District Attorney Kliebert argued: "Your honor, he didn't say I was his sole landlord. I think I have about 40 acres out of 600." The trial judge ultimately denied the challenge for cause, ruling:
I'm going to deny the cause [challenge]. I questioned [him] again and he indicated he had no problem with Mr. Kliebert being his landlord. He would vote his conscience. And that if he had to, it would be a hardship, and in the sense it would be a hardship on anybody, but he could listen, pay attention to the facts of this case and decide the case if he had to.
The law in Louisiana is clear that a relationship between a prospective juror and the district attorney does not automatically disqualify the prospective juror from service. State v. Jones, 345 So.2d 1157, 1161 (La.1977); State v. Fairley, 25,951, p. 3 (La.App. 2 Cir. 5/4/94), 645 So.2d 213, 216, writ denied, 94-2909 (La.3/24/95), 651 So.2d 287. The existence of a relationship, even one of blood or marriage, is not sufficient to disqualify a juror unless the facts reveal that the nature of the relationship is such that it is reasonable to conclude it would influence the juror in arriving at a verdict. LSA-C.Cr.P. art. 797. The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the person injured by the offense, the district attorney, or defense counsel. It requires that jurors be fair and unbiased. Fairley, 25,951 at 3, 645 So.2d at 216. However, a prospective *307 juror's statement that he or she will be fair and impartial is not binding on the trial court. If the revealed details of the relationship are such that bias, prejudice or impartiality may be reasonably inferred, a juror may be properly refused for cause. State v. Lewis, 391 So.2d 1156, 1158 (La. 1980).
At issue here is a challenge for cause based on a potential juror's status as a lessee of the prosecuting attorney. The issue of whether the existence of a landlord-tenant relationship with the lead prosecutor disqualifies a potential juror due to the appearance of bias, prejudice or impartiality has not previously been addressed by this court. Louisiana has no per se rule requiring disqualification upon proof of a landlord-tenant relationship.[2] In Louisiana, LSA-C.Cr.P. art. 797(3), which permits a challenge for cause in cases of a personal ("by blood, marriage,... friendship, or enmity") or employment relationship between the potential juror and the district attorney, does not specifically mention the landlord-tenant relationship; therefore the relationship does not appear to be inherently suspect. Nevertheless, the purpose of allowing challenges for cause is to secure a fair and impartial trial. State v. Rogers, 241 La. 841, 886, 132 So.2d 819, 834 (1961). The key to securing this right is to ascertain whether there is anything in the disclosed relationship between a potential juror and the district attorney (whatever form that relationship takes) that would influence the juror's judgment or that would persuade him or her to decide the case on any basis other than fairness and the evidence presented in court. See, State v. Groves, 311 So.2d 230, 234-235 (La.1975), overruled on other grounds by State v. Lee, 331 So.2d 455 (La.1975). For example, in Groves, a case addressing a business relationship between a potential juror and the district attorney, this court held that the trial court did not err in denying a challenge for cause of a prospective juror who was manager of a car dealership from which the district attorney had purchased an automobile; the evidence demonstrated there was nothing in the relationship that would influence the juror's judgment or persuade him to decide the case on any basis other than fairness and the evidence. Id. Similarly, in State v. Lee, 559 So.2d 1310, 1317 (La.1990), we held the fact that a prospective juror had previously retained the district attorney in an unrelated legal matter and might do so again in the future was insufficient to warrant a challenge for cause absent a further showing of bias. In each of these instances, the prospective jurors declared that the disclosed relationship would not affect their deliberations, and there was no evidence of any overriding consideration that might impact the jurors' ability to act with impartiality.
By way of contrast, in State v. Monroe, 366 So.2d 1345, 1347 (La.1978), this court reversed a conviction and remanded after finding that a challenge for cause should have been sustained against a prospective juror who, at the time of trial, was employed *308 as an assistant district attorney assigned to the Career Criminal Bureau, in the same office as the assistant district attorneys who were trying the case. Although the prospective juror testified that he would be fair and impartial, we held that such a statement is not binding on the court if the revealed details of the relationship are such that bias or prejudice may be reasonably implied. Id. Likewise, in State v. Lewis, supra, we held that a cause challenge should have been sustained against a prospective juror who had formerly served as a law clerk to the district attorney and who had a job application pending at the time of trial. A similar conclusion was reached in State v. Fairley, supra, where the court of appeal held that it was reasonable to conclude that a potential juror who worked as a babysitter for the district attorney, having extensive contact with his family and deriving a significant portion of her income from that position, would be influenced by that relationship in arriving at a verdict. Each of these cases involved an employment at will relationship (or, as in Lewis, a potential employment at will relationship) in which the closeness of the ties and the evidence of possible economic repercussions from the juror's service were such that it was reasonable to infer the juror would be influenced by that relationship, the juror's statement to the contrary notwithstanding.
The situation in this case is distinguishable. The landlord-tenant relationship presented here is distinctly different from the employment relationships outlined above, where certain persons (for example, law clerks in the district attorney's office, assistant district attorneys or household employees of district attorneys), by the very nature of their employment, are likely to be affected in their judgment by the employment relationship. Unlike those cases, there is no evidence in this case that a significant portion of Martin's livelihood is dependent on the good will of the assistant district attorney. To the contrary, the record reveals Martin is an independent businessman (a sugar cane farmer) and only about six percent of the acreage that Martin farms is leased from the assistant district attorney. Neither is there evidence that the lease between the parties is anything other than an arm's length transaction, or that the relationship requires any regular contact or marked familiarity between Martin and Kliebert. In short, there is no evidence to indicate that Kliebert wields any influence over Martin, or that economic repercussions might ensue from Martin's service on the jury. In fact, Martin was firm and unwavering in his conviction that the association would not influence his judgment. The trial court, weighing the entirety of Martin's voir dire responses, found his assertions in this regard to be credible.
While the existence of a landlord-tenant relationship between a potential juror and an assistant district attorney bears scrutiny, as does every instance in which there is some disclosed association with a defendant, a victim, a prosecuting attorney or defense counsel, each case must be decided on its individual facts. In this case, Martin's responses during voir dire do not reveal facts from which bias, prejudice, or impartiality may be reasonably inferred. In fact, those responses reveal that Martin was more concerned with being away from his crop than with his position as a lessee of the assistant district attorney. Considering Martin's responses to the voir dire examination as a whole, the record supports a finding that the trial court did not abuse its discretion in denying defendant's challenge for cause on the grounds of Martin's relationship with the assistant district attorney.
*309 In a similar vein, the record demonstrates no support for defendant's contention that the trial court erred in denying his challenge for cause based on Martin's statement that it would be a "big distraction" if he were forced to be absent from his sugar cane crop. During examination by the State, Martin first brought the crop situation to the court's attention, stating that it "would be tough" to arrange for care of his crops during any period of sequestration. When asked if it would be possible, however, he responded: "Well, I guess." Upon further questioning, he stated that "if I had to I'll have to do it." The trial court listened to these responses, and indeed to the entirety of the voir dire questioning, and determined that although Martin indicated serving on the jury would be a hardship, he could listen, pay attention, and decide the case if it were necessary. As mentioned above, a trial court is afforded broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Cross, 93-1189 at 7, 658 So.2d at 686. Given Martin's responses to the voir dire as a whole, and not just selected inquiries from defense counsel, it cannot be said that the trial court abused its discretion in denying the defense's challenge for cause in this respect.

Doris Poirrier
Defendant contends the trial court erred in denying his challenge for cause as to prospective juror Doris Poirrier based on her apparent predisposition to impose the death penalty.
A prospective juror is properly excluded for cause because of his or her views on capital punishment when the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." State v. Tate, 01-1658, p. 9 (La.5/20/03), 851 So.2d 921, 931, quoting Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The "substantial impairment" standard applies to those who would vote automatically against capital punishment, i.e., those excludable under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as clarified by Witt, as well as to those who would vote automatically for capital punishment, i.e., reverse-Witherspoon excludable jurors. State v. Divers, 94-0756, pp. 7-8 (La.9/5/96), 681 So.2d 320, 324; State v. Miller, 99-0192, p. 8 (La.9/6/00), 776 So.2d 396, 402. In the so-called reverse-Witherspoon situation, the basis of the exclusion is that the juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him." State v. Robertson, 92-2660 at 8 (La.1/14/94), 630 So.2d at 1284. See also, Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Such jurors are "not impartial," and cannot "accept the law as given ... by the court," subjecting them to cause challenges under LSA-C.Cr.P. art. 797(2) and (4). The trial court must, upon a challenge for cause, disqualify a potential juror unable to consider both life and death as penalties. Tate, 01-1658 at 17, 851 So.2d at 935; Divers, 94-0756 at 8-13, 681 So.2d at 324-327.
As noted previously, a trial court is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of that discretion. Cross, 93-1189 at 7, 658 So.2d at 686; Robertson, 92-2660 at 4, 630 So.2d at 1281. A trial court's refusal to excuse a prospective juror for cause is not an abuse of discretion, *310 notwithstanding that the juror has voiced a seemingly biased opinion, when after further examination and instruction, the juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. Tate, 01-1658 at 17-18, 851 So.2d at 936; Robertson, 92-2660 at 4, 630 So.2d at 1281. Thus, the prospective juror who simply indicates his or her personal preference for the death penalty need not be stricken for cause. Tate, 01-1658 at 18, 851 So.2d at 936; State v. Lucky, 96-1687, p. 6 (La.4/13/99), 755 So.2d 845, 850. Not every predisposition or leaning in any direction will rise to the level of substantial impairment. Tate, supra; State v. Taylor, 99-1311, p. 11 (La.1/17/01), 781 So.2d 1205, 1217.
In the instant case, during voir dire, Poirrier responded to initial questioning from the trial court as follows:
THE COURT: Ms. Poirrier, you indicated that you were for the death penalty. Would you automatically impose the death penalty if there was a conviction of First-Degree Murder or would you be willing to look at the circumstances of the crime and the person himself before making that decision?
MS. POIRRIER: Oh, well I would look at it, but I'm one of the people who believe eye for an eye and a tooth for a tooth.
THE COURT: Ma'am?
MS. POIRRIER: You know, if you kill somebody, you don't deserve to live.
THE COURT: I can't hear you, I'm sorry.
MS. POIRRIER: I said if you took somebody's life, you don't deserve to live either.
THE COURT: Would you automatically vote for the death penalty, irregardless or would you be willing to look at 
MS. POIRRIER: I would be more willing to go for the death penalty.
THE COURT: Okay. Would you automatically vote for it or could somebody persuade you otherwise?
MS. POIRRIER: Well, it all depends, you know. But the chances of me voting for it would be greater.
THE COURT: Okay. But there are some circumstances where you would not vote for it?
MS. POIRRIER: Yeah, well, I mean they'd have to prove to me that he didn't do it.
THE COURT: Well, that's my question. If you find as a juror that he did do it, would you automatically impose the death penalty or would you be willing to look at things such as 
MS. POIRRIER: No, I'd automatically go for the death penalty.
THE COURT: No matter what?
MS. POIRRIER: No matter what.
Following this exchange, defense counsel questioned Poirrier further:
MR. ARMOND: Now, ma'am, earlier you said that if he's convicted, then you would vote for the death penalty, right?
MS. POIRRIER: Yes.
MR. ARMOND: Are you aware of the fact that the law says that if you find him guilty of all these elements  and they stole the statute from me (indicating)  if you find that a First-Degree Murder was committed during the perpetration of an armed robbery, okay, are you aware that the State mandates, requires that you sentence him to life unless you find at least one aggravated factor? Are you aware of that?
MS. POIRRIER: No.
MR. ARMOND: Could you follow that?

*311 MS. POIRRIER: I guess I'd have to. I don't want to be breaking the law.
MR. ARMOND: So if the laws say he's guilty of First-Degree Murder, you're satisfied it's First-Degree Murder, you won't automatically vote for the death penalty, will you?
MS. POIRRIER: No, the law says I can't, I can't.
MR. ARMOND: But you really want to, don't you?
MS. POIRRIER: That's right.
At the close of the panel, the trial court queried the panel members generally:
[I]f we get to the second phase of this case, which is the Penalty Phase, the law tells us there are certain things we consider that would be detrimental to the defendant, certain things we consider that would be beneficial to him. The detrimental things would be aggravating circumstances, and there is a list of those. Mitigating would be things that are in his favor that you are to consider. If I read a list of the aggravating circumstances to you and the mitigating circumstances to you, could you in your heart, your sole [sic], and mind give some attention to each one of those aggravating circumstances or mitigating circumstances and seriously consider them in making your decision whether to impose the death penalty or not to impose the death penalty? Would anybody have any problem with that?
. . . .
If I told you, you had to seriously consider the youth of this person, whether or not he was intoxicated. I'm not telling you how to vote, but I'm saying you have to consider all these factors in making your decision. Could you genuinely do that?
. . . .
Does anyone feel that they could not do that?
Poirrier did not raise her hand or otherwise indicate that she would have difficulty following these instructions.[3] Nevertheless, at the close of the colloquy, defense counsel challenged Poirrier for cause, arguing that she was adamant in her pro-death penalty stance. The trial court denied the challenge for cause, explaining: "I know that, but you rehabilitated here [sic] whenever you got her in there. She said that she would not automatically vote for the death penalty and that she would follow the instructions of the court. She was rehabilitated by the Defense, so I'm going to deny that challenge for cause."
We do not find an abuse of discretion in the trial court's ruling in this regard. Indeed, a review of Poirrier's entire voir dire examination reveals that after defense counsel and the trial court explained the penalty phase procedure and the law with respect thereto, Poirrier indicated a willingness to follow the law, including the instruction that she consider both a life sentence and the death penalty.
Of course, as defendant points out, Poirrier confided to defense counsel that but for the law, she would "want to" impose the death penalty. Such a statement, combined with her remarks at the opening of voir dire that she believes in "an eye for an eye" and would "automatically vote for the death penalty" do raise concerns about her ability to afford defendant a fair trial. However, Poirrier was firm in her conviction that "I don't want to be breaking the law," and the trial court apparently afforded *312 great credibility to this statement in finding Poirrier sufficiently rehabilitated to survive the cause challenge.
In State v. Lucky, supra, we pointed out there is no statutory or legal presumption in favor of any penalty, and individual jurors often have their own inchoate or unarticulated predispositions. Lucky, 96-1687 at 7-8, 755 So.2d at 850-851. Such personal predispositions do not offend the law, provided they do not "substantially impair" the juror's ability to follow the law. Significantly, we noted, it is in the determination of substantial impairment that the trial court's broad discretion plays the critical role. Id. Thus, for example, in Lucky, we upheld the trial court's denial of a cause challenge with respect to a juror who stated that he was predisposed to the death penalty and that the mitigating evidence would have to be substantial for him to recommend a life sentence. We found the record of the voir dire, taken as a whole, supported the trial court's assessment that the juror's responses did not significantly impair the performance of his duties as a juror. The juror indicated he would consider mitigating circumstances without rejecting any specific mitigating circumstance and simply suggested that only serious mitigating circumstances would incline him to a life sentence recommendation after a guilty verdict. Id.
Similarly, in State v. Hart, 96-0697, pp. 7-10 (La.3/7/97), 691 So.2d 651, 656-658, we upheld the trial court's denial of a cause challenge against a juror who believed that the death penalty for an intentional killing "ought to be the law," but who agreed to abide by the judge's instructions and to consider both life and death as possible sentences. We found the trial judge did not abuse his discretion in concluding that the juror understood the law and was willing to follow that law regardless of his own opinions as to what he thought the law should be.
Finally, in State v. Miller, supra, we upheld denials of cause challenges with respect to two prospective jurors who, like Poirrier, expressed a personal predisposition for the death penalty and, in addition, voiced support for the "eye for an eye" paradigm. In Miller, juror Ronald Lindsly expressed his opinion that if an individual "purposefully takes somebody else's life th[en] they are accountable ... and ... deserve to die," and that "if you take somebody's life you deserve to lose your own." He did not literally believe in the biblical notion of an eye for an eye. Miller, 99-0192 at 18-19, 776 So.2d at 408. Juror Majorie Roy, on the other hand, believed in "like the Bible said, an eye for an eye and a tooth for a tooth," although she thought that she could consider a life sentence. She expressed her opinion that "if you take [a] life then your life should be taken," that she would "probably" vote for death automatically if a guilty verdict was returned, and that she was "not sure that [she] could" impose a life sentence because "[t]he lady [victim] got no choice. She didn't get a second chance." Id., 99-0192 at 20-22, 776 So.2d at 408-409. This court held that the trial judge did not err in denying the cause challenge as to juror Lindsly because, despite his "eye for an eye" discourse with defense counsel, he expressly agreed to consider both death and life sentences and to consider any mitigating evidence, as required by law. As to juror Roy, this court upheld the trial court's denial of the challenge for cause on the strength of the trial judge's assessment that Roy had "candidly answer[ed] that she could consider a life sentence," and that her emotional quotation of biblical passages would not affect her stated ability to fairly consider voting for a life sentence. Id., at 99-0192 at 20-22, 776 So.2d at 408-409.
*313 As we cautioned in Miller, drawing the line in cases of this type is often extremely difficult. The trial court must determine the merits of the challenge on the basis of the entire voir dire, and on the court's personal observations of the potential jurors during questioning. Miller, 99-0192 at 14, 776 So.2d at 405-406. As a result, a reviewing court should accord great deference to the trial court's determination and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify the jurors' qualification or disqualification. Id.
In this case, the trial court found that Poirrier's responses as a whole indicated she could put aside her personal opinions and act fairly. Based on our review of the entire colloquy, we do not find she expressed "an unconditional willingness to impose a death penalty under any and all circumstances." See Tate, 01-1658 at 19, 851 So.2d at 936, quoting State v. Chester, 97-2790, pp. 14-15 (La.12/1/98), 724 So.2d 1276, 1285-86. To the contrary, Poirrier acknowledged a sincere and serious obligation to follow the law, which the trial court found to be highly credible. Accordingly, the trial court did not abuse its discretion when it denied the defense's challenge for cause of Poirrier.

Clancey Louque
Defendant contends the trial court erred in denying his challenge for cause as to juror Clancey Louque because her husband and brother had, at one time, worked for victim "Jack" Jackson; her husband had also worked in some unspecified capacity for the sheriff's office in St. James Parish, and her sister-in-law had been involved in a case that the assistant district attorney had prosecuted. These myriad associations, defendant maintains, eliminated any prospect that Louque could serve as a fair and impartial juror and warranted her exclusion pursuant to LSA-C.Cr.P. art. 797(3): where "[t]he relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict."
During voir dire, Louque volunteered that her husband and brother had worked for Jackson, explaining: "I don't know him personally, but he was my husband's boss and my brother's boss. . . . I seen him, but I don't know nothing about him. I never spoke to him, I just know what he looks like." Further, she explained that she did not know anything about the case, had not read about it in the newspaper, or seen anything on television, and "didn't even know what [she] was coming to court for." She acknowledged that when she told her brother she had been summoned for jury duty, he mentioned it might have something to do with his ex-boss, but insisted that he did not tell her anything more about Jackson. As to her husband's former employment with the sheriff's office, she confirmed that she could listen to all the evidence, make her decision based on the evidence, and act fairly in deciding the case. For his part, the assistant district attorney acknowledged that Louque's husband had worked for the sheriff's office, but explained he had been fired.
At the close of the colloquy, defense counsel challenged Louque for cause. The trial court denied the cause challenge, stating:
I'm going to deny the challenge for cause on the basis that she indicated the only thing she knew about it was that whenever she got her subpoena and was getting ready to come here, her husband *314 said,["] it's [sic] probably involves a guy I used to work for.["]
She's not, according to her testimony, saying that she knew him, knew anything about him, that she knew either Mr. Jackson or Mr. Robinson or knew anything about them, wouldn't recognize them and that she could be fair and impartial and also consider all mitigating and aggravating circumstances and the death penalty. She is going to be sequestered, so there's no chance of her talking to her husband or trying to find out anything about this case.
Defendant fails to demonstrate an abuse of discretion in the trial court's ruling in this regard. It is clear from the attorney's questioning that Louque's connection to the victim, Jackson, was tenuous at best. She explained she did not know Jackson personally, had not heard anything about him, and had no knowledge of the event for which she was being summoned to court to appear as a juror. There is no indication her remote connection to Jackson would prejudice her to the point that she could not serve as a fair and impartial juror. See, State v. Clark, 340 So.2d 208, 215 (La.1976) (Even where a prospective juror knows a victim of the offense, the defense must show the juror's acquaintance with the victim is such that it is reasonable to conclude it would influence the juror in arriving at a verdict to warrant a cause challenge.).
Moreover, the fact that Louque's husband had worked for (and been fired from) the sheriff's office does not alone disqualify her from service. See State v. Jones, 474 So.2d at 926. Again, there must be a showing the relationship is such that it is reasonable to conclude it would influence the juror in arriving at a verdict. LSA-C.Cr.P. art. 797(3). No such showing was made in this case. Louque's answers demonstrated she could be fair and impartial, and the trial court properly accepted them at face value, there being nothing in the responses from which bias or partiality might be inferred. In any event, defendant had two peremptory challenges remaining when he unsuccessfully challenged Louque for cause. He did not use one of his peremptory challenges on Louque, and therefore waived the alleged error. See, State v. Bourque, 622 So.2d at 229-230 (A defendant waives his right to complain about the denial of a cause challenge when he subsequently accepts the challenged juror although he has a remaining peremptory challenge).

James Becnel
Defendant contends the trial court erred in denying his challenge for cause of prospective juror James Becnel. According to defendant, during defense counsel's questioning of this prospective juror, Becnel demonstrated a reluctance to hold the State to its burden of proving defendant's guilt beyond a reasonable doubt, requiring his exclusion pursuant to LSA-C.Cr.P. art. 797(4). ("The juror will not accept the law as given to him by the court.")
Specifically, defendant complains of the following exchange:
MR. ARMOND: Okay. But if you went back in the back to deliberate and you're back there and you're saying, yeah, you know, they put on some evidence, it looks like he probably did it, but there is something out there, there is something missing, something doesn't sound right, how would you deal with it?
. . . .
MR. BECNEL: It would bother me, really. I'd have to ask more questions of you, notes or whatever we can take whatever, go through everything again to be sure.

*315 MR. ARMOND: Well you're not really allowed to take notes.
MR. BECNEL: Got to ask questions.
MR. ARMOND: But if the state puts on the case, he probably did it. I'm pretty sure he did it, but there's something missing. I can't put my finger on it. What do you think?
MR. BECNEL: I can't answer that.
MR. ARMOND: You can't answer that?
MR. BECNEL: I probably would vote guilty.
At the close of the panel, defense counsel challenged Becnel for cause on the ground that "[h]e said when we were voir diring [sic] about guilt or innocence and reasonable doubt that if he thought that the guy probably did it and even if he had a doubt, he would probably vote guilty anyway." The trial court disputed defense counsel's interpretation of Becnel's responses, explaining: "I heard him and I don't think he indicated that." The court denied the challenge for cause.
Reading the record of the voir dire examination of this potential juror as a whole, it is clear that the trial court was correct in its assessment of Becnel's ability to hold the State to its burden of proof beyond a reasonable doubt. Becnel's voir dire responses, considered as a whole, and not in a piecemeal fashion, reveal a potential juror who would work to deliberate further when he was not quite sure of his verdict, and seek to resolve any unresolved doubts by the means available to him. Moreover, a juror who "probably" would not listen to a nagging doubt for which he could not assign a rational reason based on the evidence (or lack thereof) presented at trial is not a juror who cannot hold the State to its burden of proof beyond a reasonable doubt. Based on his responses as a whole, Becnel was clearly competent to apply the trial court's instruction at the close of the case that the State "does not have to prove guilt beyond all possible doubt. Reasonable doubt is based on reason and common sense and is present when after you have carefully considered all the evidence, you cannot say that you are firmly convinced of the truth of the charge." The trial court did not abuse its discretion when it denied the challenge for cause of Becnel.
Accordingly, defendant's assignments of error Numbers 18 and 19 lack merit.

Peremptory Challenges and Batson v. Kentucky

In assignments of error Numbers 15, 16, and 17, defendant maintains the State exercised its peremptory challenges in a manner aimed to exclude prospective African-American jurors, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). See also, LSA-C.Cr.P. art. 795. Specifically, defendant contends prospective jurors Lee Ester Bolden, Dynell Butler, and Larry J. Burke, Jr. were impermissibly excluded by the State.
In Batson, the Supreme Court held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of that person's race. Id. 476 U.S. at 84-89, 106 S.Ct. at 1716-19. To determine whether relief is warranted under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and circumstances which raise an inference that the prosecutor used his or her peremptory challenges to exclude potential jurors on account of race. The burden of production then shifts to the State to come forward with a race-neutral explanation. If a race-neutral explanation is tendered, then the trial court must decide, in the final step of this three-part analysis, whether the defendant has established purposeful racial discrimination. *316 Purkett v. Elem, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 1770-1771, 131 L.Ed.2d 834 (1995) (per curiam). To be facially valid, the prosecutor's explanation need not be persuasive or even plausible. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. Id. Faced with a race-neutral explanation, the defendant must then prove purposeful discrimination to the trial court. Id. The proper inquiry, in this, the final step of the Batson analysis, is whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral explanations, is sufficient to persuade the trial court that discriminatory intent is present. State v. Hobley, 98-2460, p. 19 (La.12/15/99), 752 So.2d 771, 783. Because the factual determination pertaining to purposeful discrimination rests largely on credibility evaluations, the trial court's findings are entitled to great deference by the reviewing court. Hobley, 98-2460 at 20, 752 So.2d at 783; Batson, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21.
In the instant case, defendant argues the State exercised peremptory challenges on the basis of race when it used 11 of its 12 peremptory challenges to strike African-Americans. However, defense counsel objected on Batson grounds only once during the proceedings, after the State had used four of five peremptory challenges to strike African-Americans. In failing to renew the Batson challenge thereafter, and failing to request a race-neutral explanation for subsequent peremptory challenges, counsel waived the Batson claim with respect to the State's remaining seven peremptory challenges. LSA-C.Cr.P. art. 841; see e.g. State v. Snyder, 98-1078, pp. 7-8 (La.4/14/99), 750 So.2d 832, 839-840.[4] The jury finally empaneled in the instant case was composed of nine white jurors and three African-American jurors.
Defense counsel's Batson objection was lodged in rejoinder to an unsuccessful reverse-Batson challenge by the State. At that point in the proceedings, the State had exercised five peremptory challenges, four of them against prospective African-American jurors. Two jurors had been seated  one white and one African-American. "Look[ing] at the numbers alone," the trial court ruled that defense counsel had made out a prima facie case of purposeful discrimination and ordered the State to justify its use of peremptory strikes against prospective African-American jurors with race-neutral reasons. Although we are not convinced that the "numbers alone" establish a prima facie showing of discrimination,[5] "[o]nce a prosecutor *317 has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). See also, State v. Green, 94-0887, p. 25 (La.5/22/95), 655 So.2d 272, 288.
The State offered various explanations for exercising its peremptory strikes against the four African-Americans. According to the prosecutor, Lee Ester Bolden was excused because she had only a ninth grade education. During questioning, and after explanation, she had reportedly stated that "life means life," raising concerns as to whether she understood the process and the law. Earlier, the State had challenged Bolden for cause, arguing that she was more prone to vote for life imprisonment.
As to Trevor Jeffery, the State informed the court that it challenged Jeffery because he had worked with the defendant three years previously and because of his preference for a life sentence over death. Dynell Butler was excused because he was the brother-in-law of a potential witness, Detective Lou Landry. The prosecutor explained that he "didn't want any kind of reversible error in the record," and challenged the prospective juror on that basis. Finally, the State explained that it excused Larry J. Burke, Jr. because he was pre-disposed to voting for a life sentence, and because he worked for the St. James Parish Juvenile Detention Center, and thus might be more compassionate to defendants.
The trial court found the State's race-neutral reasons for excusing the prospective jurors sufficient and overruled defendant's Batson objection without further explanation. Defendant maintains that the trial court erred in accepting the State's race-neutral explanation as to prospective jurors Bolden, Butler, and Burke because the State did not exercise peremptory challenges against white prospective jurors whose responses during voir dire revealed traits similar to those recited by the State as reasons for excusing the three African-Americans.
With respect to prospective juror Bolden, defendant argues the State's explanation that Bolden was excused because her responses and ninth grade education raised concerns as to whether she understood the law and because she was more prone to vote for life imprisonment is merely pretextual and belies the State's alleged discriminatory intent to preclude African-Americans from serving on the jury. Defendant points out several white potential jurors had educational records similar to that of Bolden,[6] and three Caucasians who expressed reluctance to impose a death sentence were nevertheless seated on the jury. However, the fact that a prosecutor excuses one person with a particular characteristic and not another *318 similarly situated person does not in itself show that the prosecutor's explanation was a mere pretext for discrimination. State v. Collier, 553 So.2d 815, 822 (La.1989). The accepted juror may have exhibited traits which the prosecutor could have reasonably believed would make him or her desirable as a juror. Id.[7]
In the present case, we can find nothing in the record that undermines the determination of the trial court that the stated reasons for Bolden's exclusion were legitimate grounds for the exercise of the peremptory challenge. Difficulty in understanding legal concepts has been deemed to constitute a race-neutral basis for exercising a peremptory challenge. State v. Smith, 222 Conn. 1, 12, 608 A.2d 63, 69-70 (1992). While it could also serve as pretext, see Splunge v. Clark, 960 F.2d 705, 708 (7th Cir.1992), there is support in the record for the State's contention that Bolden displayed confusion when queried as to her ability to return a death sentence.[8] This confusion, in turn, produced an equivocal response in answer to whether she could legitimately consider voting for death.[9] Although that response may not have risen to the level of a sustainable challenge for cause, it does support the race-neutral reasons furnished by the State after defense counsel objected on Batson grounds to the peremptory strike against Bolden. See, State v. Tyler, 97-0338, p. 7 (La.9/9/98), 723 So.2d 939, 944 (there are different degrees of death penalty leanings; a juror's feelings with respect to capital punishment can serve as a race-neutral explanation for the exercise of a peremptory strike).
As we have repeatedly noted, the ultimate focus of the Batson inquiry is on the prosecutor's intent at the time of the strike. State v. Green, 94-0887 at 24, 655 So.2d at 287. In resolving the ultimate inquiry before it  whether the proffered race-neutral explanation should be believed  the trial court should examine all of the evidence available. Tyler, 97-0338 at 4, 723 So.2d at 942-43. Patterns of strikes and other statements or actions by the prosecutor during voir dire are *319 relevant and may support a finding of discriminatory intent. Id.
The trial court plays a unique role in the dynamics of a voir dire, for it is the court that observes firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. State v. Myers, 99-1803, p. 6 (La.4/11/00), 761 So.2d 498, 502. As a result, the trial court's evaluation of discriminatory intent is entitled to great deference by reviewing courts. Hernandez, 500 U.S. at 364, 111 S.Ct. 1859, 114 L.Ed.2d 395; Hobley, 98-2460 at 20, 752 So.2d at 783.
In this particular case, there was no indication that racial animus infected the voir dire. In fact, our review of the voir dire discloses no questions or statements by the prosecutor in exercising his challenges which might support an inference of purposeful discrimination.[10] While other prospective Caucasian jurors with similar educational backgrounds as Bolden might not have been challenged by the State, the basis for the State's peremptory strike was not simply the grade level attained by the prospective juror, but concerns over whether she was able to comprehend the process and the law. Bolden's apparent difficulty in comprehending the questions posed by the State, resulting in her ability to provide only a tentative reply when asked whether she could consider the death penalty, supports the race-neutral explanation provided by the State for its exercise of a peremptory strike.[11]
The record reflects that the trial court paid close attention to the responses of each potential juror during voir dire and carefully considered the responses of the State to defendant's Batson challenge. In view of the vast amount of discretion to be accorded to the findings of the trial court in assessing intent and judging credibility, we cannot say the trial court erred in choosing to believe the race-neutral explanation offered by the State. Accordingly, we find defendant has failed to carry his burden of proving purposeful discrimination with regard to prospective juror Lee Ester Bolden.
With respect to prospective jurors Butler and Burke, the State explained it exercised peremptory challenges against these men because of a perceived bias. The State explained it challenged Butler because he was the brother-in-law of a potential witness, Detective Lou Landry, and did not wish to be responsible for creating reversible error in the record. The State also posited that Butler did not like his brother-in-law, which might result in some bias. Burke was challenged because he expressed a pre-disposition toward imposing a life sentence and because he worked for the St. James Parish Juvenile Detention Center, a position the State alternately posited might make him more pre-disposed to the State and at the same time, more compassionate to defendants *320 and more likely to impose a life sentence. While, ultimately, Butler stated his relationship with his brother-in-law would not affect his deliberations, and the State offered conflicting arguments with respect to whether Butler and Burke's connections would render them unfairly pre-disposed to the State or the defendant, the prosecutor in this case obviously perceived the disclosed connections could consciously or unconsciously affect the jurors' deliberations, and he was entitled to strike the jurors on that ground alone. See, Green, 94-0887 at 29-30, 655 So.2d at 290-291. The trial court, able to see and hear these prospective jurors during voir dire, obviously felt the State had a reasonable basis for making this call. We find the record, although scant, supports that determination. Defendant points to no other prospective white juror with connections comparable to those of Butler who was accepted by the State.[12] In addition, Burke's responses on voir dire support the State's perception that he would be more compassionate to defendants and more inclined to impose a life sentence.[13]
In conclusion, we find defendant has pointed to no evidence in the record rebutting the determination of the trial court that the State's expressed reasons for exclusion of prospective jurors Bolden, Butler, and Burke were non-pretextual and legitimate grounds for exercise of the challenges against the three African-Americans. Moreover, the record in this case is devoid of evidence supporting defendant's accusation that the State pursued a strategy of excluding African-Americans in violation of Batson. In fact, three African-Americans ultimately served on the jury that unanimously convicted defendant of first-degree murder and sentenced him to death. Although the mere presence of African-American jurors does not necessarily defeat a Batson claim, the unanimity requirement of a capital case sentencing recommendation may be considered as a factor in determining whether a prima facie case of discrimination was established. State v. Manning, 03-1982, p. 41 (La.10/19/04), 885 So.2d 1044, 1084, cert. denied, ___ U.S. ___, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005); State v. Duncan, 99-2615, p. 27 (La.10/16/01), 802 So.2d 533, 552-553; State v. Tart, 93-0772 p. 18 (La.2/9/96), 672 So.2d 116, 141. Here, the fact that the State accepted three African-Americans who eventually served on the jury provides added support for the trial court's conclusion that race was not the motivating factor behind the State's peremptory challenges.
Defendant's assignments of error Numbers 15, 16, and 17 lack merit.

Selection of Grand Jury Foreperson
In assignment of error Number 14, defendant maintains the trial court impermissibly *321 discriminated on the basis of race and sex in selecting the foreperson of the grand jury that indicted him.
To demonstrate an equal protection violation based on discrimination in the selection of the grand jury foreperson, a defendant is required to establish a prima facie case of purposeful discrimination. A prima facie showing of purposeful discrimination is established by proving: (1) those alleged to be discriminated against belong to an identifiable group in the general population; (2) the selection process is subject to abuse according to subjective criteria; and (3) the degree of under-representation, as shown by comparing the proportion of the group at issue found in the general population to the proportion called to serve, over a significant period of time. Castaneda v. Partida, 430 U.S. 482, 494-95, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). If the defendant establishes a prima facie case of discrimination using this approach, the burden shifts to the State to rebut that prima facie case. Id.
In this case, the first two prongs of the tripartite showing were never seriously at issue. African-Americans and women are both identifiable groups capable of being singled out for disparate treatment. Moreover, the procedure for selecting grand jury forepersons in effect at the time of defendant's indictment was unquestionably subject to abuse according to subjective criteria which may include race and sex.[14]Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998); Johnson v. Puckett, 929 F.2d 1067, 1072 (5th Cir.1991). Thus, the dispute in this case centers on whether defendant established the third prong of the three-part test, which requires a statistical showing of substantial under-representation over a substantial period of time, and, if he did, on whether the State successfully rebutted that prima facie showing of purposeful discrimination.
Defendant argues resort to a statistical showing of under-representation to indirectly establish purposeful discrimination is unnecessary in this case because there is direct evidence of such discrimination in the selection of the grand jury foreperson through the testimony of the Clerk of Court for St. James Parish, Edmond Kinler, Jr. Called by the State, Mr. Kinler testified that since a 1972 Louisiana Supreme Court decision invalidating the St. James Parish venire system selection process (which up to that point had excluded women from the general venire), the concerned parish officials have adopted a system that "trie[s] to alternate east west, male female, and white and black," when choosing a grand jury foreperson. Defendant argues that this testimony supports a finding of discrimination through a system of exclusion by limited inclusion and establishes that a type of quota system was employed in selecting the grand jury foreperson, in violation of the equal protection guarantee of the United States Constitution.
Defendant's reliance on Kinler's testimony to establish an equal protection violation in this instance is misplaced. Although the Clerk of Court candidly acknowledged concern about race, gender, and geographics in the effort to pick a fair cross section of the community to serve as grand jury forepersons, that type of concern is not itself discriminatory. *322 State v. Fleming, 02-1700, p. 8 (La.App. 4 Cir. 4/16/03), 846 So.2d 114, 121, writ denied, 03-1391, 1393 (La.11/26/03), 860 So.2d 1132.
In Ramseur v. Beyer, 983 F.2d 1215 (3rd Cir.1992), for example, the selecting trial judge mentioned that he employed race as a factor in an effort to pick a fair cross section of the community and to achieve "an even mix of people from backgrounds and races, and things like that." Ramseur, 983 F.2d at 1228. While finding this type of subjective sorting according to race objectionable and "ill-conceived," the federal court could not conclude that such activity violated the equal protection clause because "it apparently was not motivated by a desire to discriminate purposefully against African-Americans, nor was it apparently an attempt expressly to limit the number of African-Americans who could serve." Ramseur, 983 F.2d at 1228.
A similar conclusion was reached by the court in State v. Fleming, supra. In that case, the selecting trial judge acknowledged that in choosing the members of defendant's grand jury, he was concerned about race and gender and attempted to achieve a balance that was "consistent with the Orleans Parish demographics." Fleming, 02-1700, p. 7, 846 So.2d at 121. Citing Ramseur, the court held that such concern could not be construed as evidence of discriminatory intent sufficient to establish an equal protection violation as the judge's statement did not demonstrate a desire to limit proportionately the number of African-American jurors to a fixed percentage; rather, his concern was more a matter of logical necessity. Fleming, 02-1700 at 7-9, 846 So.2d at 120-22.
A similar conclusion can be reached here. The strategy adopted in this case, of alternating east/west, male/female and white/black, while ill-advised, did not lead to a violation of the Equal Protection clause because it apparently was not motivated by a desire to discriminate purposefully against African-Americans or females, nor was it apparently an attempt expressly to limit the number of African-Americans or females who could serve as grand jury forepersons. Quite the contrary, an attempt was made to be inclusive. The selection process did not involve the invidious discrimination of exclusion.
Further, it is clear from the record that the trial court did not err in concluding that defendant failed to carry his burden of establishing a prima facie case of purposeful discrimination by a statistical showing of under-representation over a substantial period of time. Defendant introduced evidence obtained from the Clerk of Court and Department of Elections and Registration from 1960 through September 1998 to argue that "based on the population spread in St. James Parish, you would expect to see 25 percent white males, 25 percent white females, 25 percent black males, and 25 percent black females. The actual numbers showed that 70.5 percent of the grand jury forepersons were white males, 7.7 percent were white female, 8.9 percent were black male, and 12.9 were black female." The Clerk of Court testified, however, that women only became eligible venire members in 1972. Therefore, the pre-1972 statistics the defendant relied on would have skewed the numbers to make them appear more discriminatory than more recent reality would suggest.[15] Given this flaw in defendant's statistical data, the trial court's finding that defendant failed to establish a prima facie case *323 of discrimination in the selection of grand jury forepersons does not constitute an abuse of discretion.
Defendant's assignment of error Number 14 lacks merit.

Exclusion of Evidence
In assignments of error Numbers 2, 3, 4, and 5, defendant maintains the trial court denied him the right to present a defense when it ruled three crucial items of evidence were inadmissible on hearsay grounds: a letter allegedly written by co-defendant Williams which purports to exonerate defendant; business records maintained by Fleet Boats, Inc. that indicate Williams had tested positive for marijuana while employed there; and, hospital records suggesting Robinson had been shot by a "disgruntled employee." We will address the admissibility of each of the excluded items of evidence in reverse order.

Hospital Records
At the close of his case, defendant attempted to introduce into evidence a Thibodaux Regional Medical Center "History and Physical" form prepared in connection with Robinson's emergency room admission on November 17, 1997. The form is signed by Donald Judice, M.D., and under the heading "History of Present Illness" notes: "The patient is a forty-six year old male who was shot by a disgruntled employee earlier." Defendant sought to introduce the medical report to bolster his claim that it was Williams, a former employee of Fleet Boats, Inc., who was the actual perpetrator of the crime.
The State objected to the introduction of the medical record, arguing that the statement could not have come from the victim because Robinson never regained consciousness. Thus, according to the State, the notation amounts to, at best, double hearsay. In addition, the State asserted the doctor who signed the form had since died and was, therefore, unavailable to testify.
Defendant countered that the report is admissible as an exception to the hearsay rule under LSA-R.S. 13:3714 and LSA-C.E. art. 803(4). Alternatively, defendant postulated the statement is non-hearsay and was being offered, not to prove the truth of the matter asserted, but to prove "that there are many statements made as to how this happened and what happened."
The trial court ruled the medical records admissible, but ordered that the phrase "by a disgruntled employee" be excised from the report as hearsay. Defendant contends the trial court erred in ruling the statement inadmissible.
Hearsay is defined in the Louisiana Code of Evidence as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." (LSA-C.E. art. 801 C). Hearsay is generally inadmissible unless it falls within one of the exceptions established by law.
As an initial matter, we reject defendant's argument that the statement excised from the medical report is not hearsay because it was being offered to demonstrate the inadequacies of the police investigation and to suggest that someone other than defendant committed the murder, and not for the truth of the matter asserted.[16] The statement is clearly hearsay. It was made out of court by a declarant who was unavailable to testify, and it was being offered for the truth of its content, that is, to prove that *324 someone other than defendant committed the murder. As hearsay, it is not admissible unless it falls within one of the recognized hearsay exceptions.
Louisiana Revised Statutes 13:3714 establishes an exception to the hearsay rule for certified copies of hospital records. It provides:
Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, or a copy of a bill for services rendered, medical narrative, chart, or record of any other state health care provider, as defined by R.S. 40:1299.39(A)(1) and any other health care provider as defined in R.S. 40:1299.41(A)(1), certified or attested to by the state health care provider or the health care provider, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the bills, medical narrative, chart, or record is sought to be used may summon and examine those making the original of the bills, medical narrative, chart, or record as witnesses under cross-examination.
The purpose of the statute is to save a litigant the difficulty and expense of producing as a witness each person who assisted in the treatment of the patient. Judd v. State, Dept. of Transportation and Development, 95-1052, p. 3 (La.11/27/95), 663 So.2d 690, 693. It provides that the opposing party may defend against the record by calling those who made the record as witnesses under cross-examination. Id.
Since State v. Kelly, 237 La. 956, 112 So.2d 674 (1959), this court has applied LSA-R.S. 13:3714 in criminal as well as civil cases. However, we have also recognized that because the medical records rule is an exception to the hearsay rule created by statute, it must be strictly construed, and all formalities prescribed in the law must be followed. State v. Trahan, 332 So.2d 218, 220 (La.1976).
In the instant case, when Robinson's medical records were initially offered in evidence, the State objected on grounds that the doctor who prepared the report had died, and, thus, was unavailable for cross-examination. Defense counsel did not attempt to refute this assertion, stating he would accept counsel's word as to the doctor's demise. However, because the physician who prepared the statement could not be summoned by the State for cross-examination, an essential prerequisite for admissibility of the medical report could not be established. On this basis alone, the records did not qualify for introduction under the hospital records exception to the hearsay rule.[17]
Further, even assuming the records could have been admitted into evidence, we have recognized that LSA-R.S. 13:3714 provides an exception to the hearsay rule with respect to those who made the medical record, i.e., physicians, nurses, and technicians. Judd, 95-1052 at 3, 663 So.2d at 693. In this case, the statement sought to be admitted is not the statement of a person who made the record, but the statement of an unknown declarant to the record maker.[18] It is double hearsay. As *325 such, the statement falls outside the ambit of the intended scope of the medical records exception (which must be strictly construed) and was properly excised by the trial court. See, Morris v. Players Lake Charles, Inc., 99-1864 (La.App. 3 Cir. 4/5/00), 761 So.2d 27, writ denied, 00-1743 (La.9/29/00), 770 So.2d 349; Holmes v. Caeser, 528 So.2d 1391 (La.App. 4 Cir. 1988).
In a similar vein, we find the excised statement was not admissible under the alternative exception to the hearsay rule urged by defendant: LSA-C.E. art. 803(4). Article 803(4) provides a hearsay exception for "[s]tatements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history ... insofar as reasonably pertinent to treatment or diagnosis in connection with treatment." Under this exception, the use of hearsay history of a case as told to a physician by a patient is admissible if received, not to show the truth of the facts stated, but only the basis of the physician's opinion. All of the hearsay evidence not necessary to the diagnosis is inadmissible. See, State v. Watley, 301 So.2d 332 (La.1974).
Applying this exception in State v. Bennett, 591 So.2d 783, 785-86 (La.App. 4 Cir.1991), the court ruled that a rape victim's statements to her examining physician describing the sexual contact were reasonably pertinent and admissible under LSA-C.E. art. 803(4) because the statements were not used to show the truth of the facts stated. However, the court also ruled the victim's added comment that the defendant had forced her to drive to a secluded place was not reasonably related to diagnosis or treatment, and should not have been admitted, although the error was harmless under the facts of that particular case. See also, State v. Johnson, 96-0950 (La.App. 4 Cir. 8/20/97), 706 So.2d 468 (Rape victim's statement to physician that he was robbed and forced into an alley at gunpoint did not fall within LSA-C.E. art. 803(4) exception and should not have been admitted at trial.).
Here, the statement defendant sought to introduce  that Robinson was shot "by a disgruntled employee"  was not reasonably related to diagnosis and treatment and, thus, was not admissible as an exception to the hearsay rule pursuant to LSA-C.E. art. 803(4).
Finally, defendant contends that even if the excluded statement constitutes hearsay not fitting within one of the recognized exceptions to the hearsay rule, it was nevertheless admissible because it was critical to the defense and was made under circumstances providing considerable assurances of its reliability.
As a general matter, this court has recognized that under compelling circumstances a defendant's right to present a defense may require admission of statements which do not fall under any statutorily recognized exception to the hearsay rule. State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198; State v. Gremillion, 542 So.2d 1074 (La.1989). See also, Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Normally inadmissible hearsay may be admitted if it is reliable, trustworthy, and relevant, and if to exclude it would compromise the defendant's right to present a *326 defense. Van Winkle, 94-0947 at 6, 658 So.2d at 202.
In the instant case, the statement sought to be admitted by defendant has no indicia of reliability or trustworthiness that would justify its admissibility in evidence as an exception to the well-settled rules of evidence. While the examining physician in this case had no reason to do anything other than report accurately the information that was relayed to him, there is absolutely no indication in the record as to the source of the physician's information. It is highly unlikely the statement that Robinson was shot by a "disgruntled employee" came from the victim; the medical report itself shows Robinson was unconscious during his examination, and the physician was unable to obtain any pertinent medical history, which he would undeniably have been able to do had he been able to speak with Robinson. It is equally unlikely the information came from co-victim, Jackson, as the record reveals the two men were transported from the scene to different hospitals in different cities. The physician, who is deceased, was unavailable to testify as to how he obtained the information. Thus, the circumstances surrounding the making of the statement are simply too speculative and too unreliable to merit their admission. The trial court did not err in refusing to allow defendant to introduce into evidence the hospital records containing the notation that the victim had been shot "by a disgruntled employee."

Business Records
Through the testimony of Debbie Wilson, a secretary at Fleet Boats, Inc., the defendant attempted to introduce into evidence a Corning Clinical Laboratories Forensic Drug Testing Custody and Control Form prepared in connection with Williams' pre-employment drug test. At the bottom of the form is a handwritten notation: "Positive marijuana 11/3/97." Defendant sought to introduce the document as circumstantial proof that Williams lost his job at Fleet Boats due to alleged drug use, and, thus, had a motive for killing Robinson. The trial court ruled the document inadmissible.
Defendant contends the trial court erred in excluding the document, arguing it was admissible under the business records exception to the hearsay rule, LSA-C.E. art. 803(6). That article provides, in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
. . . .
(6) Records of regularly conducted business activity. A memorandum, report, record, or data compilation, in any form, ... of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. This exception is inapplicable unless the recorded information was furnished to the business either by a person who was routinely acting for the business in reporting the information or in circumstances under which the statement would not be excluded by the hearsay rule. [Emphasis supplied.]
To exclude business records from the hearsay rule and render them admissible, LSA-C.E. art. 803(6) requires the court to *327 determine from testimony of either the "custodian or other qualified witness" that:
1. The record was made at or near the time of the event;
2. The record was made either by, or from information transmitted by, a person with knowledge;
3. The record was made and kept in the course of a regularly conducted business activity;
4. It was the regular practice of that business activity to make and keep such records;
5. The recorded information was furnished to the business either (a) by a person who was routinely acting for the business in reporting the information; or (b) in circumstances under which the statement would not be excluded by the hearsay rule; and
6. Neither sources of information nor the method or circumstances of preparation indicate a lack of trustworthiness.
The witness laying the foundation for the admissibility of business records need not have been the preparer of the records; however, the witness must be familiar with and able to testify from personal knowledge about the bookkeeping and accounting procedures of the entity whose business records are sought to be introduced. Cole Oil & Tire Co., Inc. v. Davis, 567 So.2d 122, 129 (La.App. 2 Cir. 1990). "Under Art[icle] 803(6), it is essential that a custodian or other qualified witness testimonially explain the record-keeping procedures of the business and thus lay the foundation for the admissibility of the records." Id. If the foundation witness cannot vouch that the requirements of the Code of Evidence have been met, the evidence must be excluded. Id. See also, State v. Borne, 96-1130 (La.App. 4 Cir. 3/19/97), 691 So.2d 1281, writ denied, 97-1021 (La.10/3/97), 701 So.2d 197.
In this case, Wilson, the secretary of Fleet Boats, Inc. who testified that she handled the accounting and most of the paperwork for the company, provided the necessary predicate for introduction of certain business records of the company. She identified Williams' W-4 form, completed job application, and pink slip as Fleet Boats records that were generated and kept as part of the personnel file. However, when the drug test form from the independent laboratory was presented to the witness for identification, she acknowledged that report was generated by the independent laboratory, and not by Fleet Boats. Further, she was unable to explain how the notation "Positive marijuana" came to be handwritten on the bottom of the form or by whom.[19] Under such circumstances, it is clear the necessary predicate was not established for admissibility of the Corning Laboratories form under the business records exception to the hearsay rule.
The Corning Laboratories test was obviously conducted by a third party for use by Fleet Boats. The form was not generated or made in the course of a regularly conducted business activity of Fleet Boats. Wilson had no personal knowledge as to the procedures and processes of the laboratory; nor could she identify how the handwritten notation came to be placed at the bottom of the form. She was unable to verify that the entry was made by persons who had personal knowledge of the test or of the test results. In short, she was in no position to testify as to the *328 reliability or trustworthiness of the report. As a result, the report was properly excluded by the trial court.[20]See and compare, State v. Borne, supra, (Results of defendant's pre-employment drug test not admissible under business records exception to hearsay rules absent testimony as to who had custody of the result, who conducted the drug testing, and whether the results were kept as records in the regular course of business.); Ruddock v. Jefferson Parish Fire Civil Service Bd., 96-831 (La.App. 5 Cir. 1/28/97), 688 So.2d 112, (Results of drug test properly admitted under business records exception to hearsay rule where associate director of biomedical laboratory performing the test testified he was responsible for the day-to-day operations of the laboratory, that he was familiar with the procedures and processes conducted at the laboratory upon receipt of a specimen for testing, and provided a detailed explanation of the test results.).
Moreover, it is clear from the record the defendant did not suffer any prejudice from the trial court's ruling excluding the evidence. Defendant had ample opportunity to elicit testimony that Williams was fired from Fleet Boats, Inc. because of a positive drug test, but failed to take advantage of that opportunity. Jackson, Williams' former boss, testified he remembered Williams as an employee, and, on one occasion, even gave him a ride home after work. Nevertheless, defense counsel did not question Jackson about Williams' alleged drug use or about the circumstances surrounding Williams' departure from Fleet Boats. Similarly, counsel did not ask Wilson about the results of Williams' drug test. Had he done so, Wilson would probably have denied any link between the drug test and Williams' decision to leave Fleet Boats (after working only one weekly shift), as Williams' pink slip, identified by Wilson and introduced into evidence, demonstrated he voluntarily quit several days before the drug test was even completed. Accordingly, defendant cannot show counsel was prevented from arguing that Williams left Fleet Boats on bad terms, and any error in excluding the report (which, as we have held, was not erroneously excluded) was harmless. Chapman v. California, 386 U.S. 18, 22-23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); State v. Green, 493 So.2d 1178, 1185 (La.1986).

Extrinsic Evidence Attacking Credibility
During the cross-examination of Williams, defense counsel attempted to attack Williams' credibility by introducing into evidence a handwritten letter, dated July 14, 1999. The letter, addressed to defendant, reads as follows:
Big Glynn Say man what's up with you i know your head is f[____] up about everything. But don't worry about it man. When we go to court i will explan to them people the truth. that you an [sic] had nothing to do with them charge. Man i m sorry that i had to use you up like i did. please understand man when them people got that gun i know all them other things was going to come up on me about them murders. Man I an [sic] want them people to give me the electric chair so i did that too you so i can get this little sentent [sic] and run. Now that i got that i will let them know the truth man so don't worry alright *329 how is your family doing i know they mad with me from being on you like i did but i will leave it up to you to explan what the play is about you jest try to understand man you boy had to do it like that to be kool and get back with me
Your boy Funk
In the course of his cross-examination of Williams, defense counsel handed the letter to Williams and asked him to examine it. Williams denied writing the letter, denied the letter is in his handwriting, and denied signing his name to the letter. Under questioning, Williams admitted his nickname is "Funky Ron," but denied ever signing his name "Funk." He also testified to his prison housing assignment and Department of Corrections number, both of which match the return address listed on the letter. The State objected, and the trial court apparently sustained the objection in an off-the-record bench conference.
At the close of defendant's case, defense counsel again attempted to introduce the letter, moving to enter the letter into evidence along with several other documents admittedly signed by Williams, so the jury could compare the signatures and decide whether William actually signed the letter. The State again objected, arguing the letter was both unreliable and an untimely disclosed statement of alibi, and thus should be excluded under LSA-C.Cr.P. art. 727.[21] The trial court took the matter under advisement, and later ruled the letter inadmissible under LSA-C.E. art. 403 and art. 607(D)(2), for "the reasons stated in argument by the State."
Defendant contends the trial court erred in excluding the letter, arguing it was clearly admissible as impeachment evidence attacking Williams' credibility.
As an initial matter, we note that pursuant to LSA-C.E. art. 901(B)(3), authentication of handwriting may be made by non-expert opinion or by comparison with authenticated specimens by the trier of fact or by an expert witness.[22]Kid *330 Gloves, Inc. v. First Nat. Bank of Jefferson Parish, 600 So.2d 779, 781 (La.App. 5 Cir.1992). Louisiana courts have long held the law permits the trier of fact to compare for itself known and contested handwriting samples. State v. Barrow, 31 La.Ann. 691, 692 (1879); State v. Walters, 25,587, pp. 9-10 (La.App. 2 Cir. 1/19/94), 630 So.2d 1371, 1376.
Furthermore, Louisiana has long sanctioned the impeachment of a witness in a criminal trial by his or her prior inconsistent statements. LSA-C.E. art. 607(D)(2); State v. Owunta, 99-1569 (La.5/26/00), 761 So.2d 528, 529. If the witness has had a fair opportunity "to admit the fact and has failed distinctly to do so," as provided in LSA-C.E. art. 613, extrinsic evidence of the statement is admissible, not to prove the truth of the matter asserted, but to establish the fact of contradiction for impeachment of the general credibility of the witness. Id.; State v. Burbank, 02-1407, p. 3 (La.4/23/04), 872 So.2d 1049, 1051. Of course, the admissibility of extrinsic evidence to impeach credibility of a witness is subject to the relevancy balancing test of LSA-C.E. art. 607(D)(2), which requires the court to determine whether "the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice." LSA-C.E. art. 607(D)(2); State v. Cousin, 96-2973, pp. 8-13 (La.4/14/98), 710 So.2d 1065, 1069-72.
Defendant directs this court's attention to State v. Walters, supra. In that case, the prosecutor questioned the defendant's daughter about a letter she allegedly authored. The witness denied the signature on the letter was hers. The prosecutor then instructed the witness to sign her name on a blank piece of paper and offered the signatures into evidence, arguing they were relevant for impeachment purposes: if the witness would deny a signature that was arguably hers, the rest of her testimony might be unworthy of belief. Relying upon LSA-C.E. art. 607(D)(2), the court held the signatures were properly admitted into evidence for the jury to compare and then determine credibility of the witness.
In this case, defense counsel presented the letter signed "Your boy Funk" to Williams, who denied the handwriting was his and the signature was his signature. Defense counsel then introduced several documents Williams acknowledged bore his signature. Pursuant to Walters, once Williams denied his signature on the letter, defense counsel was entitled to impeach Williams' testimony on the premise that if he would deny a signature that was arguably his, the rest of his testimony might be equally unworthy of belief.
Nevertheless, the trial court refused to receive the letter in evidence, apparently on the court's determination that the letter was a "surprise" and therefore unduly prejudicial to the State.[23] The record, however, does not support that determination. To the contrary, the record reveals the State had prior knowledge of the letter's existence, as it had asked three days earlier that the letter be produced in discovery, arguing unsuccessfully to the trial court that it presented an alibi defense. Further, when defense counsel moved to introduce the letter, the State argued it was not admissible, but nonetheless indicated *331 the State had a former FBI agent on standby, presumably to present expert testimony challenging the authenticity of the letter. Given the State's awareness of the letter and apparent preparations to meet this evidence, there is no basis for any conclusion by the trial court that the State was surprised by the letter and unduly prejudiced thereby.
When combined with the letter's claim the defendant "had nothing to do with them charge," the letter has the potential to be highly probative of the issue of Williams' credibility, or the lack thereof. Under such circumstances, the trial court's determination that undue consumption of time, confusion, or unfair prejudice substantially outweighed the letter's impact on Williams' credibility appears to be an abuse of discretion, and runs counter to established jurisprudence. Barrow, 31 La. Ann. at 692; Walters, 25,587 at 9-10, 630 So.2d at 1376.[24]
Nevertheless, a trial error does not provide grounds for reversal of a defendant's conviction and sentence unless it affects substantial rights of the accused. LSA-C.Cr.P. art. 921; State v. Johnson, 94-1379, pp. 16-17 (La.11/27/95), 664 So.2d 94, 101-102. The test is whether there is a reasonable possibility the error might have contributed to the conviction and whether the court can declare a belief that the error is harmless beyond a reasonable doubt. Chapman v. California, supra; State v. Green, supra. The reviewing court must find the verdict actually rendered by this jury was surely unattributable to the error. Johnson, 94-1379 at 16-17, 664 So.2d at 101-102; Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). In this case, the record is replete with evidence leading to this conclusion.
Fleet Boats secretary Debbie Wilson testified that while she left work shortly before the murder, she had been at her desk when Robinson arrived at the office that day. From her vantage point, she could observe his car as he drove up, exited the car, and entered the office. She did not see him speak to anyone in the parking lot, and he did not have any visitors during the entire time she was present in the office. Nevertheless, police found defendant's fingerprints on a cigarette pack in Robinson's office. Further, defendant stipulated police found a Bryco .380 pistol in his possession. A ballistics expert matched this gun to a bullet recovered from the scene. Additionally, a post office employee reported she observed two men in a gray Chevrolet pull into the parking lot of the post office just before the shooting. Williams testified he waited in the post office parking lot while defendant entered the Fleet Boats office and robbed and shot Robinson and Jackson. Finally, although Jackson was unable to identify defendant in a line-up, he did testify he remembered Williams as an employee. However, he did not identify Williams as the job applicant who approached him that afternoon and later robbed and shot Robinson and him. Given this evidence, we find that any error in the exclusion of the letter was clearly harmless.[25]
*332 Because the trial court did not err in excluding the Corning Laboratories form indicating that Williams had tested positive for marijuana while employed at Fleet Boats or the hospital records suggesting that Robinson was shot by a "disgruntled employee," and because any error in the exclusion of the letter allegedly written by Williams was clearly harmless, the defendant was not deprived of the opportunity to present a defense. The trial court's evidentiary rulings do not undermine the reliability of the jury's verdict in this case. Defendant's assignments of error Numbers 2, 3, 4, and 5 lack merit.

Adequacy of Funds for Defense
In assignments of error Numbers 6 and 7, defendant maintains the State failed to provide him with sufficient funds for his defense, forcing him to go to trial without necessary investigatory and expert assistance, which prejudiced his ability to present an adequate defense.
Part of the State's obligation in providing effective assistance of counsel to indigent defendants is the obligation to provide the indigent defendant's counsel with the basic tools of an adequate defense at no cost to defendant. State v. Touchet, 93-2839 (La.9/6/94), 642 So.2d 1213, 1215 (citing Britt v. North Carolina, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971)). Such basic tools have been recognized by this court to include the services of private investigators and expert witnesses. See, e.g., State v. Madison, 345 So.2d 485 (La.1977) (private investigator); State v. Carmouche, 527 So.2d 307 (La. 1988) (expert in fingerprint analysis and serology).
Defendant claims the trial court recognized his entitlement to State funding for experts, but failed to insure that such funding was actually available. The record in this case establishes the trial court granted an "Ex Parte Motion for Funds for Psychiatric Expert" filed by defendant on August 18, 1998. At a pre-trial hearing to address outstanding motions, conducted on February 19, 1999, defense counsel informed the court he had not yet received the funds the trial court had ordered in August, but suggested waiting to address the funding issue until the next hearing. At that hearing, on April 19, 1999, defense counsel informed the court the director of the Louisiana Indigent Defender Board (since re-designated the Louisiana Indigent Defense Assistance Board) had informed defense counsel the Board lacked any funds for the instant case until June 1999. Defense counsel further informed the court he had not yet received funding for an investigator or psychiatric expert, and counsel for the penalty phase had not yet reached a funding agreement with the State.
Both the trial court and the district attorney expressed a willingness to help locate available funding. The trial court encouraged the attorneys to meet on their own to discuss the matter, then to submit proposed orders to alleviate any funding problem. The trial court voiced concern that "we're going to get a month before the trial and we're pretty much ready to go except we find out there's no money, no experts, they haven't looked at him yet, and there's no attorney on board for the penalty phase." Both parties apparently agreed to the meeting, with the State offering to attempt to secure funds if defense counsel provided an estimate of what was needed. The trial court ordered counsel to contact counsel for the penalty phase and have him prepare an estimate of what it would cost to represent the defendant during the penalty phase and tender it to *333 the district attorney. Finally, the court discussed the possibility of issuing a "show cause" order to the Louisiana Indigent Defender Board to determine why it had not yet agreed to fund the case.
The State subsequently filed a pleading captioned "Rule to Show Cause Why the Director of the Louisiana Indigent Defender Board Should Not Be Held in Contempt for Failing to Release Funds for an Expert." A hearing on the rule was conducted on June 21, 1999.[26]
After this hearing, defense counsel made only two references to funding troubles. He explained on the day before jury selection began that although defendant had been examined by two doctors, he could not provide the State with a copy of the psychiatric expert report because of "many myriad problems paying these people." He also stated during voir dire that "[t]he law says in the death penalty phase [ ... ] I'm not required to do anything [ ... ] The reason for this is not that we have things to hide, it's just that there may not be resources."
To this court, defendant asserts the funding problems outlined above precluded him from mounting an adequate defense. Specifically, defendant argues that had defense counsel possessed adequate funds, he would have attempted to interview the neurosurgeon who treated Robinson in the emergency room and who noted on his medical report that Robinson had been shot by a "disgruntled employee," thereby assuring the admissibility of this excluded item of evidence. In addition, he would have investigated the notation found on the report from Corning Clinical Laboratories indicating Williams had tested positive for marijuana while he worked for Fleet Boats, and would have paid for an expert in fingerprint analysis to test fingerprints on the pack of cigarettes found at the scene of the shooting. Finally, defendant claims that properly funded defense counsel would have secured the assistance of a handwriting expert to determine whether Williams, in fact, authored the letter exonerating defendant from involvement in the murder and robbery.
However, defendant presents nothing to support his claim that it was the lack of funding, rather than trial strategy, that led to counsel's failure to take the outlined actions. As revealed above, both the prosecutor and the trial court made sincere efforts to assist defense counsel in obtaining the necessary funding. After the hearing on the Rule to Show Cause directed to the Louisiana Indigent Defender Board, defense counsel made only two brief references to funding troubles, neither of which related to the steps defendant now contends his trial counsel should have taken. Under these circumstances, defendant cannot show the trial court's rulings in any way denied him funding for the counsel to which he is constitutionally entitled.
Moreover, even assuming it was a lack of funding that led to counsel's failure to take the steps defendant insists he should have taken, defendant fails to demonstrate that the denial of the expert assistance substantially prejudiced him at trial. See, State v. Prestridge, 399 So.2d 564, 581 (La.1981) (When an indigent defendant has been denied funds to obtain expert assistance, the issue on review becomes whether the denial of funds substantially prejudiced the defendant at trial.). Defendant acknowledges the neurosurgeon who treated Robinson died before defendant *334 was arrested. Thus, any efforts by an investigator to interview the doctor would have been fruitless. As to the report from Corning Clinical Laboratories allegedly reflecting Williams' positive test for marijuana, counsel had ample opportunity during trial to elicit testimony from either Jackson or Wilson that Williams was fired from Fleet Boats because of a positive drug test, but failed to take advantage of that opportunity. Finally, no request was made for funds for the appointment of a fingerprint or handwriting expert; therefore, defendant could not have been prejudiced by the failure of the State to provide funds for these experts.
Defendant's assignments of error Numbers 6 and 7 lack merit.

Arbitrary Factors in Sentencing Proceeding
In assignments of error Numbers 23, 24, 25, 26, 27, and 28, defendant claims his death sentence is the product of an array of arbitrary factors erroneously interjected into the sentencing proceeding. More specifically, he contends the trial court conducted a defective guilty plea colloquy during his 1987 armed robbery conviction; thus, evidence of that armed robbery should not have been admissible during the penalty phase of the trial. He also contends that during the penalty phase closing argument, the State commented directly on defendant's failure to testify, and that a $10 "dime" bag of marijuana was erroneously admitted into evidence without proper foundation for its admission. Finally, defendant contends statements made by defense counsel during voir dire and opening statements in the penalty phase effectively diminished the jurors' sense of responsibility for imposing a death sentence. According to defendant, these errors, alone and cumulatively, undermine the fairness of the sentencing proceeding and the reliability of the jury's verdict, requiring that defendant receive a new sentencing hearing. We will address each of the alleged errors in turn.

1987 Guilty Plea
As part of its case-in-chief in the penalty phase of this proceeding, the State introduced evidence that defendant had a prior armed robbery conviction. Defendant objected to the State's use of the conviction, arguing that the plea colloquy was invalid under Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and, as a result, the conviction was inadmissible. The trial court overruled the objection.
As a general proposition, the validity of a guilty plea turns on whether the defendant was informed of three fundamental constitutional rights  his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers  and whether, having been informed of those rights, the defendant knowingly and voluntarily waived them. Boykin, supra; State v. Jones, 404 So.2d 1192, 1196 (La.1981); State ex rel. Jackson v. Henderson, 260 La. 90, 103, 255 So.2d 85, 90 (1971). Louisiana courts have expressly refused to expand the Boykin advisement to encompass all rights the defendant may be waiving or to include all possible consequences of a guilty plea. State v. Nuccio, 454 So.2d 93, 104 (La. 1984) (Boykin does not require "advising the defendant of any other rights [besides the fundamental triad] which he may have, nor of the possible consequences of his actions."). When a defendant is represented by counsel, the trial court accepting his guilty plea may presume that counsel has explained the nature of the charge in sufficient detail that the defendant has notice of what his plea asks him to admit. Henderson v. Morgan, 426 U.S. 637, 644-46, 96 S.Ct. 2253, 2257-58, 49 L.Ed.2d 108 (1976). The ultimate inquiry under Boykin *335 is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. North Carolina v. Alford, 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970).
In this case, defendant asserts that his 1987 guilty plea to the charge of armed robbery could not have been intelligent and voluntary, as required by Boykin, because the trial court gave an incorrect definition of armed robbery when informing defendant of the offense to which he was pleading guilty.[27] However, the transcript of the guilty plea colloquy indicates defendant was represented by counsel at the entry of his plea. The transcript also indicates defendant was informed of and waived his right to confront the witnesses against him, his right to remain silent, and his right to a trial by jury. In exchange for his plea, defendant received a sentence of 15 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, a sentence significantly less than the 99-year sentence defendant faced had he elected to go to trial. LSA-R.S. 14:64. In addition, the State agreed to enter a nolle prosequi as to four unspecified charges pending against defendant.
As the transcript of defendant's guilty plea colloquy clearly reflects, all constitutional requirements for accepting defendant's guilty plea were satisfied. Further, he was represented by counsel, who presumably explained the nature of the charge against him in sufficient detail to provide him notice of what he was being asked to admit. Because the guilty plea colloquy demonstrates defendant's plea was a voluntary and intelligent choice among the alternatives open to him, the trial court did not err in allowing the 1987 armed robbery conviction into evidence.

Failure to Testify
During closing argument, the prosecutor stated:
I have a tough job. I normally enjoy my job. Sometimes my job is sickening. It's sickening because you've not heard, you have not heard the word[s] "I'm sorry."
He talks about Glynn Juniors being remorseful. You never heard in this statement that he said, I'm sorry. They want to play a shell game with you. With the slight of hand they want to direct your attention to Ronald Williams. I've never ever told you that Ronald Williams was a good citizen. I never told you that. People need to face responsibility and quit shifting. Shifting the responsibility.
Defendant claims this statement was a direct comment on his failure to testify, an impermissible avenue of attack that tainted the entire sentencing proceeding.
As an initial matter, we note defense counsel failed to contemporaneously object to the prosecutor's statement. While the lack of objection does not preclude the issue from review in this pre-Wessinger case,[28] it is a factor that can be *336 considered in examining the impact of the prosecutor's closing argument. State v. Taylor, 93-2201, p. 21 n. 10 (La.2/28/96), 669 So.2d 364, 376 n. 10. "[T]he lack of an objection demonstrates the defense counsels' belief that the live argument, despite its appearance in the cold record, was not overly damaging." Id.
In any event, LSA-C.Cr.P. art. 770(3) provides that the trial court "shall" declare a mistrial when the prosecutor "refers directly or indirectly to ... [t]he failure of the defendant to testify in his own defense." However, when, as here, no direct reference to defendant's failure to testify has been made, a reviewing court should inquire into the remark's "intended effect" on the jury. See State v. Johnson, 541 So.2d 818, 822 (La.1989).
In this case, the comments to which defendant objects appear to be directed more toward defendant's lack of remorse than his failure to testify. The prosecutor apparently intended his comments to point to defendant's character and propensities rather than to highlight the fact that he did not testify.[29] Evidence that a capital defendant shows lack of remorse does not inject arbitrariness into the proceedings, as a lack of remorse is "relevant to the character and propensities of the defendant." State v. Wilson, 467 So.2d 503, 523 (La.1985) (citing State v. Summit, 454 So.2d 1100, 1108 (La.1984), rev'd on other grounds, Summit v. Blackburn, 795 F.2d 1237 (5th Cir.1986)). As a comment directed to defendant's character and propensities rather than his failure to take the stand, the statement was permissible. See, State v. Smith, 433 So.2d 688, 698 (La.1983) (Prosecutor's comments allegedly directed to defendant's failure to testify actually related to lack of evidence.).

Bag of Marijuana
During his examination of Williams, the prosecutor asked the witness to identify as State's Exhibit 31 a "dime bag" of marijuana. The prosecutor later moved to introduce the exhibit into evidence. It was admitted over defense objection, despite the fact that no effort was made to establish the exhibit's relevance by connecting it to the State's case in any way. Defendant argues the erroneous admission of the marijuana was prejudicial and tainted the sentencing proceeding.
While it is clear from the record that the State failed to demonstrate the relevance of the marijuana to its case, defense counsel subsequently questioned Williams about his marijuana use in general, and Williams acknowledged that he had smoked a "dime bag" of marijuana before the robbery and murder at the Fleet Boats offices. At no time during the penalty phase of the trial was the marijuana linked to defendant. Under these circumstances, it appears the introduction of the bag of marijuana did not impact the jury's sentencing determination.

Seriousness and Finality of Death Sentence
Finally, defendant maintains his counsel made certain comments during voir dire and the penalty phase opening argument that lessened the jury's sense of responsibility *337 for imposition of a death sentence and introduced arbitrary factors into the sentencing process. Specifically, defendant complains defense counsel stated in front of one panel of potential jurors:
I mean, you've already been told that one person has committed the crime, confessed and has been sentenced. And that you're told that even though they let that one person do it, they're going to be asking you to kill the other person. I think the district attorney told you that each individual vote could be  is the vote if he gets death. And it rarely happens you know three people electrocuted in the last couple of years.
Later, in opening statements during the penalty phase, counsel told the jury:
The evidence today that we're going to show you and present is going to tell you what it really is to impose the death penalty. I'm going to tell you about the fact that they're going to put him in a little cell. He's going to get an automatic appeal and he's going to stay there for 10 or 15 years. And Mr. Robinson's family and Mr. Jackson's family, they're never going to be able to put it away. They're always going to be wanting to know when he's going to be executed. And then one day between the hours of midnight and five in the morning, they're going to let him have a meal with his family. They're going to let him see his children.
In State v. Berry, 391 So.2d 406 (La. 1980), on reh'g, cert. denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981), this court cautioned that counsel who "refers to appellate review of the death sentence treads dangerously in the area of reversible error." Id. at 418. An argument conveying the message that the jurors' awesome responsibility is lessened by the fact that their decision is not the final one, or which contains inaccurate or misleading information, deprives a defendant of a fair trial in the sentencing phase and requires that the death penalty be vacated. Id.; See also, Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). However, in Berry we also pointed out:
[V]irtually every person of age eligible for jury service knows that death penalties are reviewed on appeal. There is no absolute prohibition against references to this fact of common knowledge, and this court should not impose an absolute prohibition, since such a reference does not necessarily serve to induce a juror to disregard his responsibility. The issue should be determined in each individual case by viewing such a reference to appellate review in the context in which the remark was made.
[Footnote omitted.]
Berry, 391 So.2d at 418.
In this case, in opening statements during the penalty phase, defense counsel mentioned the fact that defendant receives an automatic appeal. However, the comment was brief, and, in the context in which it was offered, simply presented a picture of the fate of a person sentenced to death. Defense counsel did not argue or imply that the death penalty was not serious or that ultimate responsibility for imposing the death penalty did not rest with the jury. Rather, counsel argued that imposition of the death penalty can create consequences for the victim's family that are sometimes overlooked. The argument did not serve to lessen the significance of the jury's role in the overall scheme.
Similarly, defense counsel's comment during voir dire to the effect that the death penalty is rarely imposed did not have the effect of minimizing the seriousness and finality of the death penalty. Instead, the comment emphasizes the fact that the death penalty is so serious it has *338 only been carried out three times in the last few years. While defense counsel's comments may have been delivered in an awkward manner, there is no reasonable possibility the comments led the jury "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere" or deprived the defendant of a fair trial in the sentencing hearing. Caldwell v. Mississippi, supra; State v. Jones, 474 So.2d at 930-32.
Defendant's assignments of error Numbers 23, 24, 25, 26, 27, and 28 lack merit.

SENTENCE REVIEW
Under LSA-C.Cr.P. art. 905.9 and La. S.Ct.R. 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, we consider whether the jury imposed the sentence under influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR") and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation Report ("CSI"). These documents reveal defendant is an African-American male who was 29 years old at the time the crime was committed. His mother resides in California; his father is deceased, having died when defendant was three years old. Defendant was raised by his maternal grandmother and aunt. He completed the tenth grade in high school, then earned his G.E.D. while incarcerated at the Washington Correctional Institute. Although single, defendant is the father of twins, Glynn III and Lynn, who were twelve years old at the time of trial. He has worked at various jobs, including stints as a laborer, a pot washer, a worker in waste management, and a deckhand. He also claims to have had some training as a welder.
Defendant has no known juvenile record. In June of 1986, defendant committed the armed robbery of Rodney Mason. He pled guilty in 1987, and was sentenced to fifteen years imprisonment at hard labor. The DOC released him on October 31, 1994, pursuant to LSA-R.S. 15:571.3 (diminution of sentence for good behavior). The instant offense was committed on November 17, 1997.
Defendant was apprehended by police on January 6, 1998, during an unsuccessful armed robbery attempt at the In & Out Food Store that was captured on surveillance videotape. The videotape shows defendant approaching the cashier, pulling out a gun, and firing at the cashier's head. Williams, defendant's accomplice in that offense, also implicated defendant in the December 22, 1997 robbery and murder of Joann Edler, an employee of BRS Seafood whose body was found in the walk-in cooler of the store with her throat slashed and a gunshot wound to the head. Ballistics tests performed on the bullets recovered from the BRS Seafood offense corroborated Williams' confession. At the time of this trial, these later offenses remained unadjudicated.

Passion, Prejudice or other Arbitrary Factors
The record reveals no indicia of passion, prejudice, or arbitrariness. Although defendant contends race was a factor in jury selection, we have reviewed that claim previously in this opinion and found it to be without merit. Similarly, while defendant points to several instances in which he contends his counsel, the State, and even the trial court interjected arbitrary factors into the sentencing proceeding, we have *339 discussed each of the claimed instances thoroughly in preceding sections of this opinion, and in the appendix, and have found the complaints to lack merit.

Aggravating Circumstances
During the penalty phase of trial, the State argued three aggravating circumstances existed as to the murder of Robinson: (1) defendant was engaged in the perpetration of an armed robbery; (2) defendant has previously been convicted of an unrelated armed robbery; and (3) defendant knowingly created a risk of death or great bodily harm to more than one person.
In rendering its verdict, the jury found the existence of two aggravating circumstances: the offender was engaged in the perpetration or attempted perpetration of an armed robbery; and the offender knowingly created a risk of death or great bodily harm to more than one person.[30] The record fully supports the jury's finding.
Surviving victim Jackson testified that a man later determined to be defendant shot and killed Robinson, then ordered Jackson to empty his pockets and lie on the floor. According to Jackson, defendant shot him in the back before he could comply. Williams testified that when defendant returned from the Fleet Boats office, defendant admitted shooting the two victims and handed Williams some money and a knife, which was later identified as belonging to Robinson. The evidence fully supports the jury's finding beyond a reasonable doubt that defendant knowingly created a risk of death or great bodily harm to more than one person, and the victim died during the course of an armed robbery.

Proportionality
The federal constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 712 (La.1990).
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. State v. Sonnier, 380 So.2d 1, 5 (La.1979). If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
The State's Capital Sentence Review memorandum reveals that since 1976, grand juries in Assumption, Ascension, and St. James Parishes, the three parishes that comprise the Twenty-third Judicial District, have returned indictments charging 51 individuals with first degree murder, with the following dispositions. Ascension Parish juries have recommended (and courts have imposed) death sentences twice. In Assumption Parish, two first-degree murder indictments have resulted in death sentences. In two of these previous cases, the defendants' appeals are pending in this court.[31] In one, an appeal has not yet been lodged, and in the fourth, State v. Dunn, 01-1635 (La.11/1/02), 831 So.2d 862, we pretermitted review of the sentencing phase of defendant's trial and remanded for additional proceedings in *340 light of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
Given the scarcity of comparable cases on which we can draw in St. James Parish, it is appropriate for this court to look beyond the judicial district in which the sentence was imposed and to conduct the proportionality review on a statewide basis. State v. Davis, 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-31. A state-wide review of capital cases reflects that this court has affirmed capital sentences in a variety of cases involving multiple deaths or when a defendant creates a risk of death or great bodily harm to more than one person. State v. Wessinger, supra (ex-employee returns to restaurant, shoots three and kills two); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8 (couple stabbed to death in their home during an aggravated burglary); State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076 (defendant shot and killed his estranged wife and the three men who were with her); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (ex-employee returns to restaurant, kills one employee and attempts to kill another); State v. Tart, supra (defendant murdered an elderly couple during an aggravated burglary, armed robbery); State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272 (husband kills estranged wife and new boyfriend); State v. Deboue, 552 So.2d 355 (La.1989) (murder of two children in an apartment that defendant intended to burglarize).
A state-wide review also reflects this court has, on numerous occasions, affirmed capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery. See, e.g., State v. Wessinger, supra; State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801; State v. Brumfield, 96-2667 (La.10/28/98), 737 So.2d 660; State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703; State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865; State v. Taylor, supra; State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326.
A comparison of defendant's case, in which one man was killed and another seriously wounded, with previous cases indicates the death penalty as applied to Glynn Juniors, Jr. is not disproportionate considering the offender and the offense.

DECREE
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under LSA-C.Cr.P. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by LSA-R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under LSA-R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
CALOGERO, C.J., concurs in part, dissents in part and assigns reasons.
JOHNSON, J., concurs in part, dissents in part, and assigns reasons.
*341 CALOGERO, Chief Justice, Concurs in Part, Dissents in Part, and Assigns Reasons.
The district court's exclusion of the letter[1] reportedly written to defendant, Glynn Juniors, Jr., by the State's key witness in this case, Ronald Williams, was an erroneous ruling, and the majority here makes that finding. The majority then concludes that the error was harmless because of the existence of other evidence establishing the defendants' guilt. I subscribe to the majority's position and concur in affirming the defendant's conviction of murder in this case. What I cannot subscribe to is the proposition that the erroneous admission of the letter was harmless insofar as the sentence (to death) is concerned. Although the jury may well have convicted defendant, even if the letter had been admitted, I do not believe that the exclusion of the letter had no possible effect on the jury's choice of death rather than life. Had the letter been admitted, as it should have been, at least one, if not more, of the 12 jurors might well have voted for life in prison rather than death. After all, the statement that was excluded had defendant's accomplice saying "When we go to court I will explan to them people the truth. that you an had nothing to do with them charge. Man I m sorry that I had to use you up like I did." Accordingly, I concur in the portion of the opinion that affirms the conviction, notwithstanding the erroneous, but harmless error, while at the same time dissenting from the affirming of the sentence of death. This court cannot with any degree of acceptable certainty find that the admission of the letter would not have persuaded even one of the 12 jurors to vote for life.[2]
JOHNSON, J., Concurs in part, Dissents in part, and assigns reasons.
In affirming the trial court's ruling that the state did not peremptorily strike black venire members in a discriminatory manner, the majority has nullified the application of Batson v. Kentucky in all except the most egregious circumstances. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). A criminal defendant's equal protection rights are violated where the state exercises a peremptory challenge to exclude even one prospective juror on the basis of his or her race. Batson, 476 U.S. at 87, 106 S.Ct. 1712; State v. Myers, 99-1803 (La.4/11/00), 761 So.2d 498, 500; see also La.C.Cr. P. art. 795. Furthermore, a peremptory challenge issued on the basis of race is an infringement upon the prospective juror's right to equal protection. Id. at 89, 106 S.Ct. 1712.
*342 Recently, in Miller-El v. Dretke, the United States Supreme Court had occasion to consider the race neutral reasons advanced by the state in support of its use of peremptory strikes to excuse panel members Billy Jean Fields and Joe Warren. Miller-El v. Dretke, ___ U.S. ___, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Although the state ultimately used their peremptory strikes to exclude 91% of the eligible black venire members, the Court found "more powerful than these bare statistics..., are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." Miller-El, ___ U.S. at ___, 125 S.Ct. at 2325. The Court reiterated that the rule of Batson provides an opportunity for the prosecutor to give the reason for striking the juror, and requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. Miller-El, ___ U.S. at ___, 125 S.Ct. at 2331. Thus, the Court found that when the whole of voir dire testimony subject to consideration was compared, the prosecution's reasons for striking black jurors was cast in an implausible light; which supported the conclusion that race was significant in determining who was challenged and who was not. Id.
As applied to the instant facts, the state challenged prospective juror Lee Ester Bolden because "she had a ninth grade education and we had a concern about her understanding of the process and the law. She's the one that said life means life." To begin, Ms. Bolden never made the statement, "life means life." This was a statement made by the prosecutor.[1] Ms. Bolden was questioned by the trial court judge earlier in the proceedings, and exhibited no trouble following the proceedings and indicated that she was willing to impose either life or death, depending upon the circumstances. Further, although the state alleged that Ms. Bolden's lack of education justified a peremptory challenge, the state failed to exercise a peremptory challenge against several similarly situated white potential jurors with equivalent educational records.
The majority has determined that Ms. Bolden's responses indicated sufficient equivocation to justify the exercise of a peremptory strike. Although the state alleged that Ms. Bolden was predisposed toward life, the prosecutor failed to ask her enough questions to determine whether she was in favor or opposed to the death penalty. While questioning Ms. Bolden, the prosecutor stated:
Mr. Falterman: So what I'm asking you is if, in fact, we get to the death penaltyif we get to the sentencing phase, excuse me, get to the sentencing phase, could you look that man in the eye and say, Mr. Juniors, you deserve to die. Can you do that?
Mr. Larre: Your Honor, I object. I think that is an improper statement on what the lady is required to do. I think what she's required to do is consider the death penalty, go back to the jury room, deliberate with the jurors, determine what everybody believes to be the truth and reach her own decision. And if she can indicate that whatever the circumstances of any given crime would deserve that, then she thinks she can do it, that's all she has to do.
After the trial court resolved the objection, the state failed to return to Ms. Bolden for her answer, and moved on to another member of the panel. However, Ms. Bolden expressed substantially less opposition *343 to the death penalty than Ms. Geralyn Conrad, who was accepted by the state and eventually seated as a juror.
Mr. Falterman: Ms. Conrad, no way that you could vote for death under no circumstances; is that correct?
Ms. Conrad: I don't know how it would affect me after.
Mr. Falterman: Ma'am?
Ms. Conrad: I don't know how it would affect me after.
Mr. Falterman: And I understand that. I don't know how it would affect me afterwards. I've never had to sit on a jury and I don't know how it would affect me afterwards either. But the question is could you sit and listen to the evidence, if you were selected, could you sit and listen to the evidence? If, in fact, the State convicts him of First Degree Murder, could you sit and listen to the evidence
Ms. Conrad: Yes.
Mr. Falterman: And if we prove it, what we have to prove in the penalty phase, beyond a reasonable doubt, could you vote for death?
Ms. Conrad: No.
Mr. Falterman: You could not under any circumstances?
Ms. Conrad: (Shakes head)
Although Ms. Conrad was rehabilitated somewhat by the trial court, her responses indicated reluctance to impose the death penalty, and when her responses are compared to those of Ms. Bolden, whom the trial court did not rehabilitate, the state's race neutral explanations do not withstand scrutiny. Similarly, Mr. Bart Bougeois expressed opposition to the death penalty on his juror questionnaire, however, he was rehabilitated by the trial court. The state first challenged Mr. Bougeois for cause for expressing opposition to the death penalty, yet, when the challenge was denied, failed to exercise a peremptory strike to eliminate Mr. Bougeois, who was also seated as a juror.
Purposeful racial discrimination in the use of peremptory challenges affects not only the trial itself, but the perceived fairness of the judicial system as a whole. A single instance of race or gender discrimination during the jury selection process, which is not identified and corrected by the trial court, constitutes reversible error. Id. at 95-96, 106 S.Ct. 1712. In my view, the prosecution's stated reasons for peremptorily striking Ms. Bolden were similarly applicable to white panel members who were not challenged. In Miller-El, the exercise of a peremptory strike against a minority juror whose voir dire responses were consistent with other jurors who served on the panel was proof of intentional discrimination. For this reason, I would remand this matter back to the trial court for an evidentiary hearing as it relates to Ms. Bolden.
As to affirming defendant's conviction, I concur with the majority.
APPLICATION FOR REHEARING
Rehearing denied.
WEIMER, J., would grant the rehearing in part for the limited purpose of deleting from the opinion the following statement, which is unnecessary to the proper resolution of the issues presented in this case:
In any event, defendant had two peremptory challenges remaining when he unsuccessfully challenged Louque for cause. He did not use one of his peremptory challenges on Louque, and therefore waived the alleged error. See, State v. Bourque, 622 So.2d at 229-230 (A defendant waives his right to complain about the denial of a cause challenge when he subsequently accepts the *344 challenged juror although he has a remaining peremptory challenge).
NOTES
[1] The assignments of error not discussed in this opinion do not constitute reversible error and are governed by well-settled principles of law. Those assignments are reviewed in an unpublished appendix comprising a part of the official record in this case.
[2] A small number of jurisdictions do have statutes providing that cause challenges must be granted when a landlord-tenant relationship exists between an attorney and a potential juror. See Alaska R.Crim. Proc. 24 (2004); Mich. C.R. 2.511(D)(10)(2005); S.D. Codified Laws § 23A-20-13.1 (2003). Statutes in other states, while not as specific, suggest a similar outcome. See Cal.Code Civ. Proc. § 229(b) (2005); Nev.Rev.Stat. § 16.050(1)(c) (2004); Wash. Rev.Code Ann. § 4.44.180(2) (2004). However, still other states do not provide for automatic disqualification. See Ark.Code Ann. § 16-33-304(2)(B)(i) (2004); Idaho Code § 19-2020(2) (2004); Iowa R. Civ. P. 1.915 (2003); Kan. Stat. Ann. § 22-3410(2)(b) (2003); Mont. Code Ann. § 46-16-115(2)(b) (2004); N.D. Cent.Code § 29-17-36(2) (2005); Or.Rev. Stat. § 136.220(2) (2003).
[3] Further, she did not raise her hand when the court asked the entire panel: "Does anyone feel that they cannot follow the law and instructions as given to you by the court at the conclusion of this trial?"
[4] Defendant contends the contemporaneous objection rule should not apply in this instance because there were numerous unrecorded bench conferences during voir dire, making it difficult to ascertain what actually transpired. However, we have reviewed the record of the entire voir dire and can find no indication that an unrecorded bench conference occurred during the relevant portions of jury selection. There is simply no indication that defense counsel raised a Batson objection after the State's exercise of its fifth peremptory challenge.

Moreover, although we find defendant waived his Batson claim as to the State's last seven peremptory challenges, we note that even if counsel had objected on Batson grounds, the record reflects each of the seven challenges came as a response to an unsuccessful challenge for cause. As a result, the State offered insight into the reasons for its peremptory challenges in the form of its unsuccessful cause challenges, all of which would qualify as race-neutral explanations under Louisiana law.
[5] At the point at which the Batson objection was lodged, 25 prospective jurors had been questioned  12 African-Americans and 12 whites. Two jurors had been seated  one African-American and one white. Defense counsel had used six peremptory challenges to excuse white prospective jurors; the State had used only four out of five peremptory challenges to exclude African-Americans. Such statistics alone do not suggest that the State had established a pattern of exercising a disproportionately high percentage of its peremptory challenges to excuse African-Americans from the jury. See, State v. Duncan, 99-2615, pp. 20-23 (La. 10/16/01), 802 So.2d 533, 548-550. See also, State v. Manning, 03-1982, pp. 39-41 (La.10/19/04), 885 So.2d 1044, 1083-84, cert. denied, ___ U.S. ___, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005).
[6] Specifically, juror questionnaires reveal that Linda Marse completed the tenth grade (one grade more than Bolden), Larry Donaldson, like Bolden, completed the ninth grade, as did Jerry Becnel, while Frank Rizzuto completed the eighth grade.
[7] We are cognizant of the Supreme Court's recent statement in Miller-El v. Dretke, ___ U.S. ___, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), cautioning that "[i]f a prosecutor's proffered reasons for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's, third step." ___ U.S. at ___, 125 S.Ct. at 2325. Nevertheless, such evidence remains but one form of circumstantial evidence that is probative, but not necessarily dispositive, of the issue of intentional discrimination. Miller-El confirms that the ultimate inquiry involves an examination and weighing of the totality of relevant circumstances. Thus, in finding purposeful discrimination in Miller-El, the Supreme Court concluded that the proffered race-neutral reasons for the State's peremptory strikes against blacks were pretextual. Intentional discrimination was proved, not solely on evidence that the State's proffered reasons for striking black venire persons applied just as well to white venire persons who were allowed to serve, but also on evidence of other discriminatory practices during jury selection, such as the prosecution's shuffling of the venire panel, its disparate inquiry into prospective jurors' views on the death penalty, its disparate questioning regarding minimum acceptable sentences, and the widely known and proved practice of the District Attorney's office to exclude blacks from juries at the time defendant's jury was selected.
[8] When asked a specific question about whether she could "vote death" in the penalty phase if the State met its burden of proof, Bolden responded: "Could you say life imprisonment?"
[9] When asked by the State if she could impose the death penalty knowing that upon a conviction for first degree murder, "life meant life," she responded: "I guess so."
[10] Cf., e.g., State v. Harris, 01-0408, p. 9 (La.6/21/02), 820 So.2d 471, 477, where the prosecutor stated that she was challenging the prospective juror because he was the "only single black male in panel with no children," thereby explicitly placing race at issue, and Tyler, 97-0338 at 7, 723 So.2d at 944, where defense counsel specifically objected to a second jury coming in because it contained "more white people than black people."
[11] The fact that the State did not challenge prospective white jurors who expressed similar reluctance to impose a death sentence does not in and of itself establish pretext and discriminatory intent in this instance as the accepted jurors did not, like Bolden, demonstrate confusion in applying the law as explained to them. See, Collier, 553 So.2d at 822.
[12] Defendant points to the State's failure to challenge prospective white jurors Chad Bourgeois, Clancey Louque, and Keith Martin as proof that its challenge of Butler was a mere pretext for intentional discrimination. However, the connections of these prospective jurors were more attenuated than those of Butler. Bourgeois had attended school with Detective Gary Martin, but explained that the men do not see each other much. Louque's husband and brother had worked for victim Jackson, but she explained she did not know Jackson, had not heard anything about him, and had no knowledge of the event for which she was being summoned to court to appear as a juror. Finally, Martin was a lessee of the assistant district attorney, but there was no indication that his business relationship with the prosecutor would affect his ability, consciously or unconsciously, to deliberate fairly and impartially.
[13] When first asked whether he could consider the death penalty, Burke answered negatively. Although he later retreated somewhat from this position, he never explained what circumstances might lead him to vote for the death penalty.
[14] Defendant was indicted on February 10, 1998, prior to the enactment of 1999 La. Acts 984 § 1, amending LSA-C.Cr.P. art. 413(B) which was passed in response to Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998), and which removes from the trial court the ability to select even one grand juror in a non-random and thus potentially discriminatory manner.
[15] The Clerk also testified that the grand jury selected to hear the defendant's indictment was led by an African-American female fore-person, and was comprised of six African-Americans and six whites.
[16] While the adequacy of a police investigation is a legitimate ground of inquiry, it is nevertheless an inquiry subject to hearsay rules.
[17] We note also, and defendant concedes, that the records do not comply with the certification requirements of LSA-R.S. 13:3715.1(E). However, the State did not object on this ground and the trial court did not base its ruling on such an objection. See, State v. Williams, 346 So.2d 181, 188 (La. 1977).
[18] The report itself does not identify the source of the statement. However, it appears from the record that it is most unlikely the statement came from Robinson. The "Physical Examination" section of the medical report states that "[t]he patient is unconscious." Sections of the report entitled "Past History," "Review of Symptoms" and "Family History" all report: "I am not able to obtain." These notes suggest the State was correct when it argued that the statement did not come from Robinson.
[19] Indeed, she could not verify the purpose of the test or when it was conducted. She speculated the test was a random drug screen, but the form itself indicates the test was part of the pre-employment physical.
[20] Because the report bears no indicia of reliability or trustworthiness, it was not admissible as hearsay necessary to preserve defendant's right to present a defense. See, State v. Van Winkle, supra; State v. Gremillion, supra. See also, Chambers v. Mississippi, supra. Moreover, as discussed infra, defendant was not precluded from pursuing this line of defense through the questioning of witnesses.
[21] LSA-C.Cr.P. art. 727 provides, in pertinent part:

A. Upon written demand of the district attorney stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.
B. Within ten days thereafter, but in no event less than ten days before trial, unless the court otherwise directs, the district attorney shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.
. . . .
D. Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense.
[22] LSA-C.E. art. 901 sets forth the manner in which documents can be authenticated and expressly provides the trier of fact may compare known writing samples to contested samples:

A. General Provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
B. Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Article:
. . . .
(3) Comparison by trier or expert witness. Comparison by the trier of fact with specimens which have been authenticated.
[23] In fact, when defense counsel moved to introduce the letter, the trial court turned to the prosecutor and asked: "[A]re you blindsided?"
[24] The trial court additionally refused to allow the letter into evidence for "the reasons stated in argument by the State." The State's argument was that the letter was inadmissible as an untimely statement of alibi. However, because the letter was not being offered to show alibi, but to impeach Williams' trial testimony, this ground of exclusion has no validity.
[25] Moreover, although defendant was not allowed to introduce the letter to attack Williams' credibility, defense counsel was permitted to question Williams extensively about his involvement in the crime and his plea agreement with the State and in that manner expose to the jury any potential bias and interest on Williams' part.
[26] The hearing was conducted in chambers, outside the presence of a court reporter; thus, no transcript of the hearing exists.
[27] The trial court defined armed robbery as "the unauthorized taking of anything of value from the person of another while armed with a dangerous weapon," leaving out the phrase "by use of force or intimidation." See, LSA-R.S. 14:64(A).
[28] In State v. Wessinger, 98-1234, p. 20 (La.5/28/99), 736 So.2d 162, 181, this court ended the practice of exempting sentencing hearings in capital cases from the contemporaneous objection requirement of LSA-C.Cr.P. art. 841. Nevertheless, fully aware "that this holding affects the meting out of the most serious sanctions our society can impose," the court explicitly made the contemporaneous objection rule applicable only "to the penalty phase of those trials that begin after this decision is rendered." Id.
[29] The record supports this conclusion, as it appears the prosecutor's remarks were prompted by defense counsel's comment in closing that: "The State is going to get up and tell you, not to believe everything or anything that I've told you. Not to give into your Christian beliefs, not to have compassion, that he is a vicious, brutal murderer, okay, who is remorseful. You've seen him throughout this trial and through this phase. You've had an opportunity to see him, to judge him. The State wants you to believe he is a vicious, brutal murderer. He is a victim too."
[30] While the jury did not find as an aggravating circumstance that defendant had previously been convicted of an armed robbery, the record reveals defendant stipulated to the fact he had been convicted of armed robbery in 1987 and received a 15-year sentence.
[31] State v. Blank, 04-KA-0204 and State v. Scott, 04-KA-1312.
[1] The handwritten letter read as follows:

Big Glynn Say man what's up with you I know your head is f[____] up about everything. But don't worry about it man. When we go to court I will explan to them people the truth. that you an had nothing to do with them charge. Man I m sorry that I had to use you up like I did. Please understand man when them people got that gun I know all them other things was going to come up on me about them murders. Man I an want them people to give me the electric chair so I did that too you so I can get this little sentent and run. Now that I got that I will let them know the truth man so don't worry alright how is your family doin i know they mad with me from being on you like I did but I will leave it up to you to explan what the play is about you jest try to understand man you boy had to do it like that to be kool and get back with me
Your boy Funk
[2] La.Code of Crim. Proc. art. 905.6 states as follows:

A sentence of death shall be imposed only upon a unanimous determination of the jury. If the jury unanimously finds the sentence of death inappropriate, it shall render a determination of a sentence of life imprisonment without benefit of probation, parole or suspension of sentence.
[1] In Miller-El, the Court found that the prosecutor mischaracterized a juror's voir dire testimony, and that the mischaracterization displayed an ulterior motive for keeping Fields off the jury. Miller-El, ___ U.S. at ___, 125 S.Ct. at 2327